WARD *v.* MAYOR AND CITY COUNCIL OF
BALTIMORE ET AL.

[No. 55, September Term, 1972.]

*Decided January 9, 1973.*

The cause was argued before MURPHY, C. J., and McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Henry L. Conway, Jr.*, for appellant.

*Richard K. Jacobsen, Assistant City Solicitor*, with whom were *George L. Russell, Jr., City Solicitor*, and *Clayton A. Dietrich, Chief Assistant Solicitor*, on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court.

On May 19, 1971 Thomas Ward filed a "Bill Of Complaint To Enforce A Trust" against the Mayor and City Council of Baltimore (the City) created by the City's acceptance of a devise of real estate made to it under the Will of J. Wilson Leakin. By the terms of Leakin's Will, the property devised to the City was to be sold and the proceeds "invested" by the City "in a public park." Ward alleged in his Bill that the City, as trustee, acquired the park property which it named Leakin Park; that thereafter, by Ordinance No. 1058 approved June 26, 1967, the City proposed "to cancel the trust imposed upon Leakin Park because that Ordinance in part locates and describes an expressway (I-70-N) through that Park"; and that the expressway "when completed will use more than 130 acres of Leakin Park and the noise and air pollution caused by the traffic that this road is designed to carry will completely subvert the purpose for which this trust was created." In his Bill, Ward sought to enjoin the City from constructing the highway through the Park or from providing any funds therefor.

The City, while recognizing that the Park was a public trust, maintained that construction of the highway through the Park would not constitute a violation of the trust. The court (Cardin, J.) agreed with the City's position and refused to enjoin the City from constructing the proposed highway through Leakin Park. This appeal followed.

The testimony and extensive exhibits introduced in evidence before the lower court detailed the history of the Park and of the proposed highway.

J. Wilson Leakin, by his Last Will and Testament dated October 27, 1922, made the following devise:

"I leave the Mayor & City Council of Baltimore the properties 101, 103 N. Howard Street, 113, 115 W. Fayette Street. 5 years after my decease, the said properties to be sold and the proceeds invested in a public park. . . ."

The City formally accepted the devise by Ordinance No. 105, approved September 20, 1927. Subsequently, it filed a Bill of Complaint seeking a construction of the devise to determine if its proposal to establish a number of separate neighborhood playgrounds conformed with Leakin's intent that a "public park" be provided. The lower court ruled that it would not, and its decree was affirmed on appeal. *Baltimore v. Peabody Institute*, 175 Md. 186, 200 A. 375 (1938). We there recognized the City's authority under its Charter to accept the conveyance in trust; we rejected the City's argument that it was not restricted in its use of the funds derived from the sale of the properties devised to it under Leakin's Will to the acquisition of a public park. We concluded "that a lot of neighborhood playgrounds is not a public park," and said:

"What the City has to decide now is whether it is going to accept the gift with the condition that it observe the donor's wishes and intention in the purchase, improvement, and equipment of one park, [citation omitted] with the obligation thereafter to maintain it as 'a public park.' If the City is not willing to do these things, the devise would fail and the property go to the Peabody Institute as residuary devisee." 175 Md. at 193, 200 A. at 378.

Thereafter, on June 13, 1940, the City by Ordinance No. 221 directed that "[t]he rents . . . received" and "the proceeds of the sale of . . . [the Leakin] properties, shall be turned over . . . to the Mayor and City Council

for the purchase, acquisition, improvement and equipment of land for park purposes." The Ordinance further authorized:

"The Mayor, Comptroller and President of the Board of Park Commissioners . . . to acquire out of said funds, by purchase, the property in and adjacent to Dead Run Valley, or so much thereof as the said Mayor, Comptroller and President of the Board of Park Commissioners shall deem advisable, for use as a public park. After the acquisition of said property, any balance remaining in said fund shall be used by the Board of Park Commissioners for the improvement, development and equipment thereof."

By deed dated January 15, 1941, the City purchased 243 acres of land in Dead Run Valley known as "CRIMEA" for the sum of $109,486.35. The deed recited the authority for the acquisition outlined in Ordinance No. 221 and expressly noted that the property was purchased "for use as a Public Park."

The first purchase did not deplete the fund held by the City from the sale of the Leakin properties. Apparently the Mayor considered relocating the Park in 1947. Introduced in evidence was an opinion of then City Solicitor Simon E. Sobeloff responding to that possibility and advising that, in light of the provisions of Leakin's Will, the City Charter, and this Court's opinion in *Baltimore v. Peabody Institute, supra,*

". . . if it should be decided and ordained by the City Council that the present Leakin Park is no longer needed for public use, and the park should be sold, the proceeds, together with uninvested Leakin money, would have to be invested in a single park. Unless the present park is sold, the uninvested portion of the Leakin be-

quest can be used only to extend or improve the present park."

By deed dated March 11, 1948, the City purchased 68 acres of additional park land adjacent to its first purchase, the deed again reciting the authority outlined in Ordinance No. 221 and specifying that the property was purchased "for use as a public park."

In the late 1950's, the federal government instituted a program of connecting all major population centers of the United States by limited access, high speed highways for the purpose of national defense and interstate commerce. See the Federal-Aid Highway Act, 23 U.S.C. §§ 101 *et seq.* (1966) ; Federal-Aid Highway Act of 1956, ch. 462, 70 Stat. 374. As a part of the program, a superhighway·designated Interstate-70 (I-70) was to be constructed, a segment of which was to pass through Baltimore City at a cost of approximately one billion dollars, ninety percent thereof to be paid by the federal government.

The Interstate Division for Baltimore City, organized to manage the construction and completion of the interstate system within the City, and staffed jointly by personnel of the State Roads Commission and the Baltimore City Department of Public Works, proposed that as part of the interstate system an eight-lane, limited access expressway be located through the northern portion of Leakin Park.[1] The decision was based on an exhaustive study and recommendation of an "Urban Design Concept Team" comprised of consulting experts in all facets of urban highway routing. The Concept Team's recommendation detailed a plan by which to minimize the harm to the remaining sectors of the park; under the plan all compensation received by the City from acquisition of the right of way through the park would be used to

---

1. For a history of the process of selection of the Leakin Park site, see Ward v. Ackroyd, 344 F. Supp. 1202, 1207-10 (D. Md. 1972).

make improvements to the park. In July 1970, the City's Board of Recreation and Parks unanimously adopted a resolution approving the proposal of the Design Concept Team and requesting the Interstate Division for Baltimore City to pursue funding of the intended transfer of land. The City then held a so-called Design Hearing and submitted an Environmental Impact statement, both prerequisites to federal funding of the project, on May 25 and August 9, 1971, respectively. Introduced in evidence was a letter from the United States Department of Transportation, dated April 26, 1971, to the State Roads Commission, noting that the "4F submission" had been approved, and that

> "The implementation of the 4F approval conditions will require that compensation for all right-of-way required through the park be devoted exclusively to carrying out the park development plan." [2]

2. "4F submission" refers to § 4 (f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1653 (f), which provides:
> "It is hereby declared to be the national policy that special effort should be made to preserve the national beauty of the countryside and public park and recreation land. . . . After the effective date of the Federal-Aid Highway Act of 1968 [Aug. 23, 1968], the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park . . . unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park . . . resulting from such use."

Identical language is contained in the Federal-Aid Highway Act, 23 U.S.C. § 138.

In the companion case to *Ward v. Ackroyd, supra* n. 1, the U.S. District Court declared the 4F determination "legally ineffective as the basis for compliance with 23 U.S.C. § 138 and 49 U.S.C. § 1653 (f)" in reference to the segment through Leakin Park. Plaintiff's motion for summary judgment as to all other issues was denied. Sierra Club, Inc. v. Volpe, No. 71-1118-M (D. Md., filed November 15, 1972.) We take judicial notice of the pendency of the federal case and of the incompleteness of the actions ordered therein, but in view of the public importance of the issue, we proceed to a decision on the merits. Kardy v. Shook, 237 Md. 524, 207 A. 2d 83 (1964), Lloyd v. Supervisors of Elections, 206 Md. 36, 111 A. 2d 379 (1954), Munsell v. Hennegan, 182 Md. 15, 31 A. 2d 640 (1943).

By decree dated March 16, 1972 the court below dismissed Ward's Bill of Complaint, concluding therein that "the routing of Interstate 70N through Leakin Park does not constitute a breach of the trust established by the Leakin Will. . . ." The decree was supported by the opinion of the court filed March 14, 1972 in which Judge Cardin held that while the proceeds from the sale of the Leakin properties were held in trust by the City for the park use specified in the Will, the City's plan to exchange a part of the park land so acquired for funds to improve the remaining park land was not a violation of the trust. Two apparently independent grounds were advanced by the court in support of its decision: (1) that since the park land was subject to the City's power of eminent domain, "[t]he Court in exercising its equitable jurisdiction over trusts must conclude that it is more beneficial to the trust if the City is allowed to transfer this property in exchange for valuable and extensive improvements to the park rather than subject it to condemnation"; and (2) that the proposed plan "does not constitute a breach of trust, and is in keeping with the donor's intentions" because all of the original trust *res*, the proceeds, would still be invested in the Park and improvements to the Park consistent with our construction of the donor's intent in *Baltimore v. Peabody Institute, supra.*

Ward claims on appeal that the construction of an expressway through the Park would violate Leakin's intent that his gift to the City be used for a public park. A "park," Ward contends, by typical definition (citing Black's Law Dictionary, Revised Fourth Edition, at page 1271) is "an enclosed pleasure ground in or near a City, set apart for the recreation of the public." He urges that by no stretch of the imagination could a park include, as proposed by the City, an eight-lane expressway designed to daily carry 70,400 vehicles at sixty miles per hour through a 600 foot tunnel and over a 900 foot bridge. Ward argues that Leakin never intended that the

City, after acquiring the Park with his money, would be permitted to "exchange" a part of it for money to improve the remainder. If the chancellor's decision is upheld, Ward suggests that the City will then be authorized to " 'exchange' part of the Park land for a garbage dump, another part for an incinerator, another part for a morgue and so on until the Park is 'exchanged' to practical extinction."

We consider these contentions in light of the allegations set forth in the Bill of Complaint and in view of the evidence adduced at the trial before Judge Cardin. As heretofore indicated the thrust of Ward's complaint was that use of a part of the park property to construct a highway would be inconsistent with Leakin's intent in that "the noise and air pollution caused by the traffic that this road is designed to carry will completely subvert the purpose for which this trust was created."

As shown by the evidence at trial, Leakin Park is relatively primitive and its recreational facilities largely undeveloped except for a few areas. It was Ward's testimony that the area to be acquired for the highway is unique because "so completely rugged and untrammeled." Commenting on the recreational facilities available in this area he testified:

> "It is not the kind of recreation you find like tennis playing, golfing, that sort of thing. It is a quiet enjoyment of a rugged woods type atmosphere. I am talking about the interior part of the park, not the developed part on the end, which does contain a ball field and tennis courts. I am talking about that part which will be destroyed by this highway."

We recognized in *Baltimore v. Peabody Institute, supra* that a trust was created under Leakin's Will whereby the City, as trustee, was obligated to use the proceeds realized from the sale of designated properties for the purchase, improvement, and equipping of *one* public park.

These proceeds are traceable, through Ordinance No. 221 and the two deeds heretofore mentioned for the land comprising the present Leakin Park, thus transferring the same trust conditions on the park which were on the proceeds. *Cf. Bass v. Smith,* 189 Md. 461, 56 A. 2d 800 (1948) ; *Gault v. Hospital for Consumptives,* 121 Md. 591, 89 A. 105 (1913) ; *Drovers' and Mechanics' National Bank v. Roller,* 85 Md. 495, 37 A. 30 (1897) ; *Cowman v. Colquhoun,* 60 Md. 127 (1883). We think it readily evident from the complete lack of restrictions in Leakin's Will that he intended that the City, as trustee, be vested with and exercise wide discretion in the matter of location, size, character, and equipment of the park.[3] We so indicated in *Baltimore v. Peabody Institute, supra,* and the City Council so recognized in enacting Ordinance No. 221, when it authorized the purchase of property in Dead Run Valley "or so much thereof as the . . . Mayor, Comptroller and President of the Board of Park Commissioners shall deem advisable, for use as a public park. . . any balance remaining in said fund . . . [to be] used by the Board of Park Commissioners for the improvement, development and equipment thereof."

That the trust *res*—the park land acquired by the City —did not become fixed, immutably, under the terms of Leakin's Will by the original exercise of the City's discretion in making the acquisition is, we think, clear beyond question. What did become fixed by the City's acceptance of Leakin's gift and its acquisition, as trustee, of the park land was its obligation thereafter to dedicate the trust corpus, together with its accumulations, to pro-

---

**3.** The wide discretion of the City as trustee is one fact which distinguishes this case from the many cases contained in Annots., ("To what uses park property may be devoted") 18 A.L.R. 1246 (1922), 63 A.L.R. 484 (1929), 144 A.L.R. 486 (1943), and supplements thereto, wherein specific land was formally dedicated to park purpose by the donor. See, *e.g.,* Archbold v. McLaughlin, 181 F. Supp. 175 (D.C. 1960); City of Torrington v. Coles, 155 Conn. 199, 230 A. 2d 550 (1967); City of St. Louis v. Bedal, 394 S.W.2d 391 (Mo. 1965). We have been referred to no case wherein the same restrictions were imposed on property selected by the trustee in an exercise of his discretion.

vide and maintain a public park. Quite obviously, the City is under no duty to permanently maintain the park property in its originally acquired condition; rather, it is free to change the size and character of the park in the reasonable exercise of the discretion vested in it, so long as it continues to maintain a public park within the contemplation of Leakin's Will. To Ward and others who enjoy the rugged naturalism associated with the undeveloped sections of the Park, as it presently exists, the location of a super-highway within the confines of the Park will undoubtedly detract from the recreation afforded them by the Park's facilities. But this is not to say that an established park necessarily ceases to be a park, or to perform the functions of a park, if a super-highway is constructed through a part of it. Whether construction of a highway within a public park, with the noise and pollution resulting from its use by automobiles, will destroy or otherwise completely subvert the purpose for which parks are provided is a question necessarily dependent upon the circumstances in each particular case.

The record before us, while indicating that the highway is to be routed through the undeveloped northern sector of the Park, does not show precisely how many acres of the Park are to be acquired for the highway. Ward puts the figure at 130 acres in his Bill of Complaint, but it is apparent that this figure, if correct, also includes land for the highway to be acquired in adjacent Gwynn Falls Park. Together, the two parks appear to contain from 1200 to 1300 acres. The record does show that the City's plan recognizes that Leakin Park must remain as one park, and not two parks, with the highway as an insurmountable barrier; the plans, therefore, call for several pedestrian crossings and a 600 foot cut and cover tunnel which will provide sufficient connection of land on either side of the highway. Implicit in the lower court's finding that the proposed construction would not violate the trust is a factual finding that, on

the evidence submitted, successful coexistence of park and highway is possible and reasonably expected.

In *Waesche v. Rizzuto,* 224 Md. 573, 587, 168 A. 2d 871, 877 (1961), we said in recognizing the latitude to be given trustees who, by virtue of express language in the trust instrument, are given discretionary powers in the operation of the trust:

> "A court of equity will not interfere in the exercise of the discretionary power conferred on the trustees provided that this power was honestly and reasonably exercised. However, it must appear that the trustee acted in good faith, having a proper regard to the wishes of the testator and to the nature and character of the trust reposed in them. *Pole v. Pietsch,* 61 Md. 570, 572; *Levi v. Bergman,* 94 Md. 204. See also *Washington Col. v. Safe D. & T. Co.,* 186 Md. 89; 4 Bogert, *Trusts and Trustees,* §§ 811, 814; *Brown v. McLanahan,* 148 F. 2d 703 (C.C.A. 4th 1945)."

To like effect, see *Marburg v. Safe Deposit & Trust Co.,* 177 Md. 165, 167, 9 A. 2d 222, 223 (1939). We think the language of those cases is equally applicable in cases, as here, where the same discretion is necessarily implied by lack of directions or restrictions placed on the trustee. *Cf. Gordon v. City of Baltimore,* 258 Md. 682, 267 A. 2d 98 (1970).

On the record before us, we are unable to find that the City's proposal is unreasonable or advanced in bad faith. Faced with the necessity of constructing a highway to alleviate traffic conditions on Route 40, and to connect segments of the Interstate system already under construction, the City has considered all possibilities and made a decision, approved by the U.S. Department of Transportation, that there is no other feasible and prudent alternate route and that all possible planning has been done to minimize harm to the park, as required by

23 U.S.C. § 138.[4] The plans call for construction of the highway through Leakin Park in a manner to minimize harm to the Park. Faced with the need and a workable plan, the Interstate Division for Baltimore City could have effectuated the condemnation of the trust property by a request to the federal government, 23 U.S.C. § 107; *United States v. Certain Parcels of Land,* 209 F. Supp. 483 (S.D. Ill. 1962), aff'd *sub nom. United States v. Pleasure Driveway and Park District of Peoria, Illinois,* 314 F. 2d 825 (7th Cir. 1963) ; *cf. United States v. Carmack,* 329 U. S. 230, 67 S. Ct. 252, 91 L. Ed. 209 (1946).[5] The City chose instead to make a voluntary transfer which in its judgment, acting as trustee, would insure a greater return for the beneficiaries of the trust in increased park facilities to be constructed with the funds realized from the sale of the park land for the highway. *Cf. Hiland v. Ives,* 154 Conn. 683, 692, 228 A. 2d 502, 506 (1967). Considering all the circumstances, we think the City's exercise of the discretion vested in it was made with the requisite degree of reasonableness, honesty, and good faith. *Waesche v. Rizzuto, supra; Marburg v. Safe Deposit & Trust Co., supra.* Nothing in the record demonstrates that the Park will be destroyed or its purpose substantially impaired by the highway's construction within its northern confines. In fact, to some persons, the Park may more effectively meet their needs for recreational activity when the additional recreational facilities are erected therein with the funds obtained from the transfer of park land for the highway.

We therefore conclude that Judge Cardin correctly determined that the City's proposal to construct a high-

---

4. See, however, n. 2, *supra.*

5. The parties have given considerable attention, both in the lower court and on appeal, to the issue of eminent domain under applicable municipal, state, and federal law. It is clear from the record that no condemnation proceedings have been instituted (Ordinance No. 1058, cited in the Bill of Complaint, condemned private land contiguous to the park, but condemned no property in Leakin Park). We think the issue's relevance is limited to its bearing on the reasonableness of the City's decision to forego condemnation and proceed by a voluntary transfer of the trust property.

way through Leakin Park would not violate the trust, so long as the funds received in exchange for the highway right of way are invested in the improvement of the remaining sections of the Park. In view of our conclusion, we find it unnecessary to consider the validity of the other ground advanced by Judge Cardin to support his decision.

*Decree affirmed with costs.*