THE CITY OF BOWIE ET AL. *v.* BOARD OF COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY ET AL.

[No. 135, September Term, 1970.]

*Decided December 14, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Ferdinand J. Mack,* with whom were *Shadoan & Mack* on the brief, for appellants.

*Richard W. Case,* with whom were *John T. Joseph, Smith, Somerville & Case, Lionell M. Lockhart, County Attorney,* and *Harry L. Durity, Deputy County Attorney,* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

We shall be concerned here with another skirmish, per-haps the last, in the revolt of the appellants (Bowie) against the proposed Prince George's County airport. In the court below Bowie sought to enjoin the appellees

(County) from "offering for sale or selling [the airport] bonds" and from "acquiring * * * [and] clearing land * * * or taking any other action to develop or construct an airport" in the southwest quadrant of the intersection of U. S. Route 301 and State Route 214 (Central Avenue). We disposed of the bond question in *The City of Bowie v. County Commissioners for Prince George's County*, 258 Md. 454 (1970), by upholding the partial summary judgment entered by the chancellor, Digges, C.J. (now a member of this Court), that the bonds "were lawfully authorized, sold, issued and delivered and [that they] constitute valid, legally binding and enforceable general obligations" of the County.[1] The remaining issue, i.e., the one arising out of the prayer to enjoin the construction of the airport, came on for trial before Powers, J., on 10 March 1970. After three days of trial Judge Powers dismissed Bowie's amended bill of complaint after stating his reasons for so doing in a careful and comprehensive oral opinion delivered from the bench. It is from his order, dated and filed 19 March 1970, that Bowie has appealed.

The County proposes the construction of a runway 5,-400 feet long on a course running N by W and, reciprocally, S by E. Plans for the future contemplate a 1,600 foot extension (to 7,000 feet) and the construction of a parallel runway 4,500 feet long.[2] The airport will be what the Federal Aviation Administration (FAA) calls a "larger than general utility airport," designed to accommodate "large business-type jets," weighing 60,000 pounds and capable of carrying 24 passengers. In the beginning only operations [3] subject to Visual Flight Rules

---

1. Bowie sought, without success, to enjoin the Administrator of the Federal Aviation Agency from allocating federal funds or taking any other action to assist in the development or construction of the airport. *The City of Bowie v. J. H. Shaffer*, Civil Action No. 20756 in the United States District Court for the District of Maryland.

2. The length, in feet, of other runways provides informative comparisons: Dulles 11,500; Andrews 9,755; Friendship 9,450; Washington National 6,870.

3. An "operation" is one takeoff or one landing.

(VFR) will be allowed. It is expected, however, that in about three years operations subject to Instrument Flight Rules (IFR) will be possible. In 1975, it is said, there will be about 150,000 operations, 30,000 of which, give or take a few thousand, will be accounted for by heavy aircraft. If these hopes are realized there is no doubt that the airport will be a very busy place.

The north end of the runway will be 5,000 feet south of the city limits of Bowie which now has a population of about 36,000; by 1980, they say, the figure will be about 68,000. It is alleged that aircraft taking off from and landing at the airport "will emit unusual, unreasonable, and unnecessary noise, vibration, dust, stench and filth * * * creat[ing] danger, fear, hurt, [and] inconvenience" and that they will "make life unbearable" for the citizens of Bowie and deprive them "of the use of their properties."

## I.

In the Washington area there is an organization known as the Metropolitan Washington Council of Governments (COG). Code (1966 Repl. Vol.), Art. 25, § 26A. It consists of representatives of Prince George's County, Montgomery County, the cities of Washington and Alexandria, and the Virginia counties of Arlington and Fairfax. It is required by Section 204 of Public Law 89-754, 42 U.S.C. § 3334, that applications for federal funds be submitted to COG for review, and that its comments and recommendations shall "be reviewed by the [pertinent] agency of the Federal Government [in this case the FAA] for the sole purpose of assisting it in determining whether the application is in accordance with the provisions of the federal law which governs the making of the loans or grants." Judge Powers found that "two preliminary applications of some sort involving the airport * * * [had been] submitted to COG for review, and [had been] reviewed by COG." In respect of a third application, filed in January 1970, he had this to say:

"* * * It was acknowledged on February 3, and it was stated by the executive director of

COG that the review would be made and transmitted to the county; but on February 25 the executive director wrote a letter to Mr. Aluisi, Chairman of the Board of Commissioners, Prince George's County, stating, 'As Mr. Francois requested, COG's review of the proposed Prince George's County Airpark will be deferred until the several hearings now in process have been completed. We will retain the materials previously submitted.

" 'When appropriate, please instruct me by letter to proceed with the review.'

"While it is true that the review involved here is a prerequisite under the law to the county's obtaining a federal grant in connection with the development of the airport, it is not a legal requirement for the construction of the airport. It is only a requirement with respect to receiving a federal grant. There is no indication that the reviews could not be obtained, and the court concludes that this should not be such a barrier as to justify injunctive relief."

We see no reason to suppose the COG, which found "no conflict with metropolitan planning" in the preliminary applications, would do otherwise than comment favorably on any subsequent application. Even if its comments should turn out to be unfavorable it is unlikely the federal grant would be withheld. We agree with the conclusion reached by Judge Powers.

## II.

Bowie insists that the County has not obtained the approval of the State Aviation Commission.[4] Not so, says

4. The State Aviation Commission will be abolished, on 1 April 1971, by virtue of Chapter 526 of the Laws of 1970 when it will become a part of the newly created Department of Transportation. From and after 1 July 1971 all of its "rights, powers, duties, obligations and functions" will be transferred to and exercised by the "State Aviation Administration."

the County. Code (1968 Repl. Vol.), Art. 1A, § 14 (d), provides, in part, as follows:

"No municipality in this State * * * shall submit to the Administrator of Civil Aeronautics of the United States [now the Federal Aviation Administration] a project application under the provisions of * * * the 'Federal Airport Act' * * * unless the project has first been approved by the Commission [after 1 July 1971 'the Secretary of Transportation of Maryland']. No such municipality shall directly accept, receive, receipt for or disburse any funds granted by the United States under the Federal Airport Act, but it shall designate the Commission [after 1 July 1971 the 'Administration'] as its agent and in its behalf to accept, receive, receipt for and disburse such funds."

Bowie argues that the Project Application was never approved by the Commission but it will be observed that the statute requires the approval of the project rather than the application for federal funds. The County points out that the Airport Layout Plan was signed by Charles B. Allen, the Chairman of the Commission, suggesting the approval of the Commission, and that, on 6 February 1968, the County and the Commission entered into the agency agreement required by § 14 (d) of Art. 1A, *supra*. David B. Snyder, the Director of Aeronautics, testified that while the minutes of the Commission do not, in fact, indicate an approval of the project, the signature of Mr. Allen "on any drawing of any project of an airport in the state * * * will indicate that the * * * Commission has given * * * [its] approval to that project." Mr. Allen testified the Commission did approve the project. In respect of the absence of any record of its action in the Commission's minutes he said the "director, the late Rudolph A. Drennan, was [at the time] seriously ill * * * [and that he] was having difficulty getting around." Mr. Allen recalled the meeting at which the County's

project was considered; he thought all of the members had been present, and that the vote to approve the airport had been unanimous. Although Judge Powers did not make a flat finding of approval by the Commission he did find, and we agree,

> "that whatever defect exists here * * * results from the untidy condition of the Commission's records [which] is not fatal, can be corrected if necessary, and would not be such as to warrant enjoining the project."

### III.

Bowie offered to prove that facilities entirely adequate for Prince George's County aircraft already exist, that the airport would be a "financial catastrophe" in that by 1994 it "will have operated at a deficit of $5,456,000," and that there are available more suitable sites where the same facilities could be constructed for less money. Judge Powers sustained, correctly we think, the County's objection to the proffer.

It may indeed be true that the proposed airport is not a necessity and that the County can get along quite well without it. There may indeed be other sites which would serve as well and which, if used, would require the expenditure of less money. And it may turn out that Bowie has underestimated the 1994 "deficit." But those matters are not our concern. Judge Powers, in his opinion, said "the courts cannot review the wisdom of projects which elected bodies undertake, nor can courts substitute their judgment for the judgment of the people in authority who make the decisions." We think his statement reflects the settled law. *A & H Transp. Inc. v. Mayor and City Council of Baltimore,* 249 Md. 518 (1968) ; *McBriety v. Mayor and City Council of Baltimore,* 219 Md. 223 (1959) ; *Connor v. Board of Supervisors of Elections of Baltimore County,* 212 Md. 379 (1957).

### IV.

Bowie's next and apparently principal contention is

that the proposed airport is a prospective nuisance which equity can and ought to enjoin. Judge Powers put the issue in this fashion:

> "The allegations of the bill focusing on the prospective nuisances of vibration, dust, stench, filth, or contamination of the atmosphere were not supported by any evidence that would form the basis of a conclusion that there was a prospective nuisance. Thus, we are left with the two contentions urged strongly by the plaintiffs; that is as to danger and as to noise."

Bowie's chief witness in respect of danger was Lt. Col. Paul E. Skinner, USAF, a flyer with more than ten years' experience and possessed of considerable expertise in the field of airport operations. In March 1970 his job (Chief, Flight Operations Division) entailed control of military air traffic in the Washington area and coordination "with the Federal Aviation Agency on matters pertaining to the Air Force." Andrews Air Force Base, he said, was his "primary responsibility." Col. Skinner's testimony is both interesting and instructive but, in the end, it comes to this: that there is a relatively small area where "those airplanes [patrons of the proposed airport] will * * * be using for a variety of reasons the same air space through which we [Air Force pilots] will be trying to fly. There will be conflict, * * * midair collisions." He conceded, however, that the tower at Andrews is under the control of FAA and that the Andrews pattern of operations must be approved by FAA. He thought it was true that FAA "believes it can provide a compatible environment between aircraft utilizing Andrews and aircraft utilizing this proposed airport," but he said he did not share that belief.

By way of rebuttal the County produced Martin Warskow, a vice president of R. Dixon Speas Associates, aviation consultants, whose forte is "air traffic systems analysis." We shall not attempt a synopsis of his comprehensive testimony. It suffices to state the conclusion he

announced and which his testimony seems to support. He said:

> "So in looking at the air space situation, all of these things of the future must be taken into account, and it was our conclusion that with the proper location of the airports and their runway directions, which we feel are proper, the two airports can be operated at their capacities, safely and efficiently."

There was also testimony of Robert Nickelsberg, the Assistant (Washington) Area Manager of FAA, that his "air traffic people" had determined that the proposed airport "would be compatible, and that includes [the] Andrews operation or Freeway [5] or anybody else in the area, and the routes out of Washington and into Washington."

Judge Powers "presumed that the authorities will conduct the operation of the [proposed] airport properly and utilize proper safeguards to protect the public." On the issue of danger he said he could not find "that there was evidence of such sufficient probative force as to support injunctive relief." We agree.

Many pages of the record deal with noise in terms of nuisance. Each side produced an expert with impeccable qualifications. Each one based his opinion on other testimony in respect of the number of operations expected to occur in the years 1975 and 1980. It seems that nearly all of the citizens (present and future) of Bowie reside (or will reside) within an area classified by FAA as "Zone 1" and from which "essentially no complaints would be expected * * * [but where] noise may, however, interfere with certain activities of the residents." Bowie's expert thought more people would be affected than did the County's expert. Otherwise their opinions did not differ in significant degree. Indeed, the testimony of Dr. John O. Powers, the acting director of the Office of

---

5. A relatively small airport in the southeast quadrant of Hanson Highway and Church Road, about five miles northwest of the proposed airport.

Noise Abatement of FAA, suggests the opinions of the noise experts in respect of conditions in 1975 or 1980 may be based on premises now shifting or about to shift. He spoke of the continuing development of "retrofit" [6] regulations. He said he could "imagine the reduction [of noise] on some aircraft would be possibly as much as 15 decibels." He expressed the hope that the regulations, to be issued "within the next * * * two months," could be implemented "in early 1971." It would be well to observe, at this point, that there is very little in the record concerning operations prior to 1975. It has been assumed that operations would begin in 1970 but it is common knowledge, at this writing, that actual construction has not yet commenced.[7] If operations actually begin in 1971 it seems fair to say that they would gradually increase during the years 1972, 1973 and 1974. But just when during that period the noise generated by aircraft would reach the "nuisance" level, if indeed it ever rises that high, it seems impossible to say. Judge Powers noted the possibility that "they may have the sound question licked by 1975."

While we have not heretofore been called upon to consider the enjoining of a proposed airport we think our predecessors have laid down both firmly and clearly the principles of law controlling the restraint of prospective nuisances. In *Adams v. Michael,* 38 Md. 123 (1873), the plaintiffs sought to restrain the defendant from erecting a factory for the manufacture of felt roofing alleging that "owing to the dirt, odor, smoke, and appurtenances of such a factory" there would ensue "irreparable and continuing injury" to their property. The chancellor's dismissal of the bill of complaint was affirmed. Judge Alvey (later Chief Judge) said, for the Court:

"There is no question or difficulty in regard

---

6. "Retrofit" appears to be Federalese for a project requiring the modification of existing aircraft, including all jets, so as "to reduce their noise levels."

7. *But see* Editorial, *Bowie Airpark—and a Board in Flight,* The Washington Post, Nov. 19, 1970, at A19.

to the principles invoked by the complainants in this case. The power to interfere by injunction to restrain a party from so using his own property as to destroy or materially prejudice the rights of his neighbor, and thus to enforce the maxim, *'sic utere tuo ut alienum non laedas,'* is not only a well established jurisdiction of the Court of Chancery, but is one of great utility, and which is constantly exercised. Indeed, without such jurisdiction, parties would, in many cases, suffer the greatest wrongs, for which actions at law would afford them no adequate redress. It is not every inconvenience, however, in the nature of a nuisance to a party's dwelling, especially in a large commercial manufacturing city, that will call forth the restraining power of a Court of Chancery by injunction. To justify an injunction to restrain an existing or threatened nuisance to a dwelling-house, the injury must be shown to be of such a character as to diminish materially the value of the property as a dwelling, and seriously interfere with the ordinary comfort and enjoyment of it. Unless such a case is presented a Court of Chancery does not interfere. It must appear to be a case of real injury, and where a court of law would award substantial damages. * * *." *Id.* at 125-26.

\* \* \*

"The granting of injunctions on applications of this character involves the exercise of a most delicate power, and the Court is always reluctant to act *except in cases where the right is clear and unquestioned, and the facts show an urgent necessity.* The general rule is, that an injunction will only be granted to restrain an *actual existing nuisance;* but where it can be plainly seen that acts which, when completed, will certainly constitute or result in a grievous

nuisance, or where a party threatens, or begins to do, or insists upon his right to do certain acts, the Court will interfere, though no nuisance may have been actually committed, if the circumstances of the case enable the Court to form an opinion as to the illegality of the acts complained of, and the irreparable injury which will ensue." *Id.* at 129. (Emphasis added.)

To the same effect *see Sullivan v. Northwest Garage & Storage Co.,* 223 Md. 544, 551-53 (1960) ; *Mayor and City Council of Baltimore v. Board of Health for Baltimore County,* 139 Md. 210, 218-19 (1921) ; *The Mayor and City Council of Baltimore v. Sackett,* 135 Md. 56, 62-63 (1919) ; *The Hamilton Corp. v. Julian,* 130 Md. 597, 600-601 (1917) ; *King v. Hamill,* 97 Md. 103, 111 (1903).

No case has been cited, nor have we found one, in which the construction of an airport has been enjoined as a prospective nuisance. But there are cases in which applications for such injunctions have been refused. *Oechsle v. Ruhl,* 140 N.J.Eq. 355, 54 A. 2d 462 (Ch. 1947), is such a case. There the plaintiffs who lived near a proposed airport sought to enjoin its construction on the ground that they would suffer from noise, dust and falling aircraft. The court said :

"In order for the complainants to succeed in their prayer for an injunction against the construction of the airport it must be clear that the airport cannot be so conducted as to not be a nuisance. Only very infrequently does the Court of Chancery enjoin the construction of a building or a facility upon the anticipation that there will be a threatened prospective nuisance by the conduct of the business in such building or facility. Normally, if the business is a lawful one the defendant is permitted to complete the structure and the question of nuisance is left to await the operation of the conduct of the business therein. Equity will not normally interfere in

advance of the creation of a nuisance where the apprehended injury is doubtful or contingent * * * and especially where the anticipated or threatened injury arises from the use to which a proposed structure is to be put and not from the structure itself. In the present case it cannot be said that the structure itself, i.e., the airport, is a nuisance and is of such a nature that it cannot be put to a lawful use." 54 A. 2d at 468.

To the same effect *see Elder v. City of Winder,* 201 Ga. 511, 40 S.E.2d 659 (1946); *Warren Township School Dist. No. 7, Macomb County v. City of Detroit,* 308 Mich. 460, 14 N.W.2d 134 (1944); *Antonik v. Chamberlain,* 81 Ohio App. 465, 78 N.E.2d 752 (1947).

Bowie seems to have encountered a great dearth of authorities in its effort to sustain its position. Indeed it has had to resort to equating the proposed airport with a bawdy-house. In *Hamilton v. Whitridge,* 11 Md. 128 (1857), the plaintiffs sought to enjoin Margaret Hamilton from occupying and using a recently purchased house as a bordello. She had been thrice convicted of keeping a bawdy-house in the years 1854 and 1855 and Judge Tuck, who wrote for the Court, noted that "between the last of these convictions and * * * [the filing of the bill of complaint] not one circumstance is shown from which we can infer that she had changed her course of life." He went on to observe that the evidence clearly indicated her firm intention to pursue her "profession" in the new house. The distinctions between *Hamilton* and the case at bar are at once apparent. Madame Hamilton's proposed use of her house would, without question, have been a nuisance on the very day she opened up for business; the operations at the proposed airport admittedly will not be a nuisance in the beginning and may never rise to that level. Madame Hamilton was denied only the use of her house as a bordello; Bowie seeks to prevent not the use but the construction of the airport.

We think Judge Powers has applied correctly the con-

trolling law and we cannot say that his findings of fact are clearly erroneous.

## V.

The County, in its brief and at argument, asserted the doctrine of legalized nuisance and, to be sure, it does seem to provide an extra string for its bow, but, in the circumstances, we find it unnecessary to prolong this opinion with a discussion of it.

Judge Powers concluded his opinion with the comment that there may "at some future time be individual cases" in which there "may be a noise condition * * * which would mount up to a total or partial deprivation of property, and, of course, there is a legal remedy for that." [8] We agree but that, obviously, is a horse of quite another color.

*Order affirmed.*
*Costs to be paid by appellants.*

---

8. For a discussion of recent developments in this regard *see* J. N. Kline, *The SST and Inverse Condemnation,* 15 Vill. L. Rev. 887 (1970).