PRINCE GEORGE'S COUNTY, MARYLAND *v.*
COLLINGTON CROSSROADS, INC.

[No. 137, September Term, 1974.]

*Decided June 5, 1975.*

*Motion for rehearing filed July 7, 1975; denied August 1, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Michael O. Connaughton* and *Ellis J. Koch, Associate*

*County Attorneys,* with whom was *Joseph S. Casula, County Attorney,* on the brief, for appellant.

*Toby Prince Brigham,* with whom were *John A. Buchanan* and *Sasscer, Clagett, Channing & Bucher* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court.

In this case, the right of Prince George's County to take by eminent domain land belonging to the appellee, Collington Crossroads, Inc., is at issue. The sole question presented to this Court is whether the purpose of the condemnation, namely the development of a multi-industry "employment center," or "industrial park," constitutes the requisite "public use" so as to justify the County's exercise of the eminent domain power.[1]

In 1968, the General Assembly authorized the issuance of bonds by Prince George's County to finance the acquisition of land for and the construction of "public airport facilities and industrial parks." Ch. 689, Acts of 1968, effective July 1, 1968. Section 1(b) of Ch. 689 provided:

> "[T]he term 'industrial parks' shall mean (i) the acquisition by any legal means, of land or property in Prince George's County generally in the southwest quadrant of the intersection of Maryland Route 214 and U.S. Route 301 in one contiguous tract as now determined by the County to be suitable as the site or sites for the establishment of one or more industrial parks to encourage and promote the creation of new industry and the growth of existing industry in Prince George's County and (ii) the grading of such site or sites, the

---

1. Article III, § 40, of the Constitution of Maryland provides:

"The General Assembly shall enact *no* Law authorizing private property, to be taken *for public use,* without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation." (Emphasis supplied.)

construction of access roads, rail service tracks and taxiways, the construction and equipment of buildings, the construction and installation of all utility services and the doing of any and all things necessary in connection with or pertaining to the acquisition and development of such land or property as industrial sites including but not limited to the architectural and engineering services incident thereto."

Section 10 of Ch. 689 contained the following legislative findings:

"(b) That a need exists for new and expanded industrial enterprises within said County and that the County Commissioners for Prince George's County should be enabled to promote industrial development therein; and

"(c) That the County Commissioners for Prince George's County by the acquisition of potential industrial lands may directly solicit industrial users of said land thereby affording the creation of employment opportunities for the residents of Prince George's County, the diversification and increase of the taxable base available to said County, and the establishment of a healthy economic mix of gainful pursuits within said County so as not to depend in too large a degree upon one segment of the economy, *e.g.*, federal government oriented industry; and

"(d) That the acquisition of potential industrial lands and construction of industrial facilities has the single object of preserving and improving the economic well-being of the residents of Prince George's County, and is found and determined to be in the public interest."

Ch. 689 and the project authorized by it have been considered by this Court on four prior occasions. In *City of Bowie v. County Comm'rs*, 258 Md. 454, 267 A. 2d 172 (1970),

Bowie challenged a trial court ruling that the issuance of $5,250,000 worth of bonds by the County under Ch. 689 was valid. We rejected Bowie's argument that the County Commissioners did not properly authorize issuance of the bonds and affirmed the trial court's decision. In *City of Bowie v. County Comm'rs*, 260 Md. 116, 271 A. 2d 657 (1970), Bowie appealed the trial court's dismissal of its bill of complaint to enjoin construction of the airport authorized by Ch. 689. We affirmed the trial court's decision that an injunction should not issue.

Next, in *Prince George's Co. v. Beard*, 266 Md. 83, 291 A. 2d 636 (1972), the County challenged a trial court ruling that the County Council had abandoned the project authorized under Ch. 689. We held that the Council by itself had no authority to abandon the project if the project had been included in the capital budget. By the time *Beard* reached us, the County had eliminated the airport feature of the industrial park project. The appellees in *Beard* raised the issue of whether the industrial park alone constituted a public use. The record the County had made concerning the specific uses proposed for the industrial park was sparse. Therefore, we remanded the case to allow the County to produce more evidence concerning the exact nature of the proposed industrial park. Judge Smith, speaking for the Court, said (*id.* at 96-97):

> "Upon the remand the County will have full opportunity to spell out the use it proposes making of the property and all the details surrounding that use. In upholding condemnation for the purpose of constructing port facilities, a use that seems to be widely permitted, our predecessors in *Marchant v. Baltimore*, 146 Md. 513, 521, 126 A. 884 (1924), spoke of the fact that the construction was 'according to a comprehensive plan, by which the commerce of the port [would] be most advantageously served, and its future growth encouraged.' In order for a court to perform its judicial function in this type of case the plan should indeed be comprehensive."

The instant case represents the latest controversy surrounding the proposed industrial park. This case was initiated when, on August 22, 1968, shortly after the effective date of Ch. 689, a petition was filed in the Circuit Court for Prince George's County by the County seeking condemnation of 323.5092 acres of land for construction of a "public airport facility." The tract sought to be condemned is located in the southwest corner of the intersection of Maryland Route 214 and U.S. Route 301. On December 3, 1968, the appellee, Collington Crossroads, Inc., filed a demurrer to the petition. On June 11, 1971, Prince George's County moved to amend its petition to allow condemnation of the land solely for the purpose of developing an industrial park. On March 3, 1972, the court denied the motion and dismissed the petition for condemnation, and the County took an appeal, *Pr. George's Co. v. Collington*, 268 Md. 69, 299 A. 2d 792 (1973).[2] There, we rejected Collington's argument that the County Council had abandoned the industrial park project, on the basis of our holding in *Beard* that inclusion of the project in the capital budget precluded its cancellation by a County Council bill. Collington conceded that the project had been included in the capital budget. We further pointed out that the Council had, subsequent to its bill attempting to withdraw authority to proceed with the project, passed another bill authorizing the Executive to proceed with plans for an industrial park.

Having concluded that the circuit court had improperly dismissed the County's petition, we turned to the issue of whether the court should have allowed the amendment sought by the County. We concluded that leave to amend

---

2. Judge Smith stated in this opinion (268 Md. at 70-71):

"We suspect that as a result of our rulings in *Beard* and in this case yet other cases arising from this proposed project will reach us. One may express the hope that the litigation emanating from this battle will not continue as long as the Hundred Years' War or, perhaps, the Wars of the Roses which it resembles in some respects since one may draw the inference that this series of cases arise in part from a tussle for power and not simply from the never ending conflict between property owners and their government when property is to be taken for public purposes."

should have been granted in order best to serve the ends of justice. We further stated (268 Md. at 78):

> "We express no opinion as to whether the use of the land of Collington contemplated by the County is or is not one for which an eminent domain proceeding may be maintained since, as indicated in *Beard*, we do not have sufficient information before us to make such a determination.
>
> "Certainly a corollary to leave to amend should be agreement upon the part of the County to proceed to trial within a reasonable time. . . . The County should either perfect its plan and proceed expeditiously or dismiss the proceedings."

Upon remand, the County filed an amended petition for condemnation of the 323.5092 acres for use as an industrial park. The petition alleged:

> "That a need exists for new and expanded industrial and trade facilities within Prince George's County in order to attract industry and related enterprise and to diversify and increase the taxable base available in the County, and that need exists also for the establishment of a healthy economic mix of gainful pursuits within the County so as not to depend too heavily on one segment of the economy—e.g., Federal government-oriented industry—and that a need exists also to create employment opportunities for the residents of the County through the promotion and growth of new and existing industries."

The appellee, Collington Crossroads, Inc., filed its answer on September 4, 1973.

A fifteen-member Industrial Park Task Force, authorized by the County Council in Bill No. CB-85-1972 and appointed by the County Executive, was assigned to formulate a comprehensive plan of development for the industrial park of which Collington's tract is proposed to be a part. The task

force submitted its final plan (the "Comprehensive Plan for the Prince George's County Employment Park") on November 23, 1973. The plan called for assembling by the County of about 1690 acres, 930 of which were already owned by the County. The plan contained the following statement of its objectives:

"Prince George's County has identified certain critical needs concerning an increasing imbalance between County potential and County realization. The proposed Employment Park is an opportunity to influence this imbalance by increasing the tax base and providing a balanced employment area with jobs for County residents, reducing their journey-to-work and increasing local control. The Park will provide a choice of prime sites for various businesses, clearly separated from residential neighborhoods. The Site, approximately 1700 acres, is well suited for the proposed use. Its development by the public sector will provide a unified, integrated system, maximizing coordination of the public resources. Such an endeavor would not be possible by private individuals except at excessive costs."

The unique beneficial effects which were expected to result from development of this employment center were described in the plan as follows:

"Development of the Employment Park will have a beneficial effect upon public needs, primarily in the creation of new job opportunities and new tax ratables. With a strong marketing program the County's economic base would be expanded with up to 632 acres of industrial development. Desirable industries would be attracted to the County, including research and development and other 'clean' industrial types. Ultimately, 8200 workers will probably be located on the Site, providing up to 5,800 new job opportunities for County residents.

> There will be a real property tax yield at Park completion of nearly $4.8 million annually. Wage potentials would be favorably affected, especially by research and development employment."

The plan was formally approved by the County Council on March 5, 1974, and by the County Executive on March 29, 1974.

On April 7, 1974, a hearing limited to the issue of the County's right to condemn the 323.5092 acre tract was held before the Circuit Court for Prince George's County (R. Powers, C. J.). The "Comprehensive Plan for the Prince George's County Employment Park" as well as other documents were presented as exhibits to the court. In addition, the court heard the testimony of Dr. David Wallace, a planning expert. Dr. Wallace testified with regard to the County's purpose in seeking to have the employment center designed: "Essentially, Prince George's County has found itself increasingly a bedroom community of the Washington metropolitan area and this is a proposal to change that circumstance." Dr. Wallace described the various commercial, industrial, and recreational uses provided for in the plan. He stated that public facilities would necessarily have to be provided to develop the industrial park. He explained the conclusions set forth in the plan:

> "We were asked by the County to determine which of a variety of alternative methods of development would be the most appropriate and came to the conclusion that the desirable characteristics of accountability, unified operation, ownership of the site, adequate financing, industrial marketing capability, flexibility in planning and disposition, pricing capability, and staffing and organizational capability, maintenance and security, and industrial financing all lead to the proposal for the creation of a development authority under State legislation which the County could avail itself of.
>
> "The recommendations, therefore, were that the

authority should have a non-profit, public-purpose emphasis built into its charter; should have industrial development as its sole purpose . . . ."

Dr. Wallace went on to delineate the economic benefits for the County that would result from the implemented plan:

"The final considerations . . . [of the plan] were in terms of public needs and fiscal benefits starting with the expansion of the County's economic base as essentially a public purpose of the plan, the attraction of desirable industrial employment, increased job opportunities for County residents, the wage potentials, attractive to the County in terms of taxes, the improvement of the tax base itself in terms of property tax, and then a consideration of the fiscal impact. In summary, the effect of the Employment Park under the proposed development program on County revenues and expenditures at completion should produce a net surplus of approximately $4.1 million to be distributed for County-wide needs annually."

On May 23, 1974, the circuit court rendered its opinion, stating that the purpose of the condemnation in this case was for private use, not public use. The court based its ruling on the fact that the commercial land "will be owned by private entities" when the park is fully developed. The court dismissed the County's amended petition for condemnation, and the County filed the present appeal.

We have concluded, upon consideration of the facts of this case, that the use proposed by the County for the land sought to be condemned is a public use rather than a private use and that, therefore, the condemnation is constitutionally permissible.

Two factors relating to the condemnation sought in this case should be emphasized.

*First*, the County Council for Prince George's County and the County Executive, in adopting the task force's comprehensive plan, made the finding that the type of

industrial park which it considered necessary for the economic well-being of the County would be too costly for private developers to carry out. The planned industrial park was meant to attract "research and development and other 'clean' industrial types" which the County had had difficulty attracting. Appellee did not present any evidence to dispute the County Council's and the County Executive's findings in this case. At oral argument, one of its contentions seemed to be that the County had an unfair advantage because of its exemption from taxes and power of condemnation, and thus should not be allowed to compete with private developers. Whatever merit this contention might have is lost in this case since the record indicates that the County will not be in direct competition with private entrepreneurs. Here the County plans a type of project which the private developers were apparently unable or unwilling to undertake.

*Second,* the County will maintain significant control over the industrial park after the commercial land therein is sold to private owners. The County will subject land conveyed to private parties to certain "development covenants." The comprehensive plan provides that "[t]hese covenants will deal with management of natural features, maintenance of health, safety and welfare, control of hazards and nuisances, and guidelines for assuring a high quality physical environment." The entire industrial park will be placed in a EIA (Comprehensive Design for Employment and Institutional Areas) zoning classification. As the comprehensive plan states, the classification "will offer Prince George's County the opportunity to control the detailed development of this 1700 acre area through the use of a three phase process of review and approval of detailed plans." Finally, the comprehensive plan provides that over 20% of the industrial park site will be preserved as permanent public or private open space. The public open space will include the "Collington Branch floodplain . . . [which] will receive open space improvements pursuant to the Maryland-National Capital Park and Planning Commission guidelines for stream valley parks." Private open space will include a golf course.

The above factors, failure of private developers to provide the necessary industrial park facilities and the continuing control the County will exert over the development of this facility, must be kept in mind in applying the cases which have dealt with the issue of what constitutes a public use.

In evaluating the use for which a governmental body attempts to exercise the power of eminent domain, the courts have the responsibility of enforcing the constitutional limitation that the use must be "public." As our predecessors said in *Riden v. Phila., B. & W. R. R. Co.*, 182 Md. 336, 340, 35 A. 2d 99 (1943):

> "Of course, the Legislature cannot make a use public merely by declaring it so. Whether a particular use for which private property is sought is in fact public is ultimately a question for the determination of the court."

*Prince George's Co. v. Beard, supra*, 266 Md. at 95; *Perellis v. M. & C. C. of Balto.*, 190 Md. 86, 93, 57 A. 2d 341 (1948); *Cox v. Revelle*, 125 Md. 579, 588, 94 A. 203 (1915); *Pitznogle v. Western Maryland R. R. Co.*, 119 Md. 673, 678, 87 A. 917 (1913); *Webster v. Pole Line Co.*, 112 Md. 416, 426, 76 A. 254 (1910); *Arnsperger v. Crawford*, 101 Md. 247, 252-253, 61 A. 413 (1905); *Van Witsen v. Gutman*, 79 Md. 405, 410, 29 A. 608 (1894); *New Central Coal Co. v. George's Creek Coal & Iron Co.*, 37 Md. 537, 560 (1873).

However, the courts have had some difficulty in their efforts to define "public use." No satisfactory single clear-cut rule regarding what is a public use, which can decide all cases, has yet been formulated. Moreover, even if it were possible to formulate such a rule, it would probably not be prudent to do so. As Judge Delaplaine stated for the Court in *Riden v. Phila., B. & W. R. R. Co., supra*, 182 Md. at 340-341:

> "Since the framers of the State Constitutions have seldom, if ever, definitely defined the term 'public use,' the courts have striven to formulate a uniform definition, but without success. The Court of

Appeals of New York recently said: 'Over many years and in a multitude of cases the courts have vainly attempted to define comprehensively the concept of a public use and to formulate a universal test. They have found here as elsewhere that to formulate anything ultimate, even though it were possible, would, in an inevitably changing world, be unwise if not futile.' *New York City Housing Authority v. Muller*, 270 N.Y. 333, 1 N.E.2d 153, 155, 105 A.L.R. 905, 910."

*See* Nichols, *Eminent Domain* § 7.2 (1974); 26 Am.Jur.2d *Eminent Domain* § 27 (1966).

This Court has made clear that "public use" does not mean that in all cases the public must literally or physically be permitted to use the property taken by eminent domain. Nor is it necessary that title to the condemned property be in the government.

In *New Central Coal Co. v. George's Creek Coal & Iron Co., supra,* the issue before the Court was the validity of a condemnation for the construction of a track from an existing railroad line across the appellee's land. The condemnation was undertaken by New Central under authority provided for in its charter which had been granted by the Legislature. The only use to be made of the railroad spur was to transport coal for private business purposes. Chief Judge Alvey stated for the Court in *New Central* (37 Md. at 560):

"Whenever, therefore, the use is in fact public, or has for its object the public benefit or utility, though coupled with private objects of gain and emolument, the question of the exercise of the power of eminent domain over private property, is exclusively one of discretion in the Legislature; but whether the use, in any particular case, be public or private, is a judicial question; for otherwise, the constitutional restraint would be utterly nugatory . . . ."

The Court concluded that use of the land for a privately owned railroad spur for the benefit of a business was, in the circumstances of the case, a "public use." The reasoning of the Court was as follows (*id.* at 561-563):

"It has certainly been the settled policy of the State, for many years past, to stimulate enterprise and to encourage the combination of capital, for the purpose of developing the large mineral resources in the western portion of the State; as upon their full and successful development depend, in a great measure, the success of the works of internal improvement upon which the State has expended many millions of money. As means of wealth and revenue, therefore, the State has a material interest in the operation of the coal and other mineral lands in that section . . . . Without the facility of transportation from the mines by railroads, there would be little or no inducement to the investment of capital, and but small progress could be made in developing the vast mineral wealth of the State, in which the public at large are interested. To furnish the requisite facilities for the construction of railroads for the successful operation of the mines is therefore, in some sense, a public necessity, and that being so, the use of the ways for such roads may well be said to be public, and therefore the right of condemnation exists. . . ."

\* \* \*

"Our conclusion is, therefore, that the use in question is of a public nature, and that it is competent to the appellants, under the authority of their charter, if there be a reasonable necessity for it, to condemn the right of way for their railroad . . . ."

In *Pitznogle v. Western Md. R. R. Co., supra,* a railroad

condemned land containing a private road for the purpose of constructing a railroad line. It also attempted to condemn a portion of an adjacent tract, partly for the railroad line and partly to build a substitute private road for the benefit of those persons entitled to use the private road which it had closed. The appellant in *Pitznogle* claimed that the portion of his land sought to be condemned by the railroad to construct the substitute private road was not being taken for a public use. The Court noted that "[in] determining this question we are to be controlled by the facts, circumstances and necessities of this case." (119 Md. at 678.) The Court stated that the railroad line was a public use. With regard to the substitute private road, the Court concluded (*id.* at 679):

> "The condemnation of a part of this land, here sought to be condemned, for a substitute private road or way is incident to and results from the taking, by reason of public necessity, of the existing private road for public use, and the use of it for such purposes should, we think, be regarded as a public use within the meaning of the Constitution."

*Marchant v. Baltimore*, 146 Md. 513, 126 A. 884 (1924), involved Baltimore City's condemnation of property situated on the shore of the Patapsco River for use in carrying out a comprehensive plan of harbor development.[3] The plan provided for the construction of wharves, piers, docks, warehouses, and buildings and for the rental of these facilities to private users. In holding that the contemplated use was public, the Court, as in *New Central Coal Co., supra,* looked to the economic benefit to be realized by the public. The Court also pointed out that the public use limitation to the eminent domain power does not literally mean in all cases "use of the public." The Court thus stated (146 Md. at 521):

"The argument is that the act, in thus proposing to

---

**3.** *Marchant* was decided long before Art. XI-D was added to the Maryland Constitution in 1951. Art. XI-D specifically permits condemnation for the purpose of developing or improving the port of Baltimore.

authorize the condemnation of property to be used by prospective lessees from the city, violates the constitutional limitation of the power of eminent domain to the taking of private property solely for a public use. In view of the objects to which the act is directed, and of the important public service which it was designed to promote, we are of the opinion that the objection to its validity should not prevail. *The development of the harbor of Baltimore according to a comprehensive plan, by which the commerce of the port will be most advantageously served, and its future growth encouraged, is a project of distinctively public interest and purpose.* It is concerned with the improvement and extension of a harbor service which constitutes an essential part of a system of water transportation connecting the port of Baltimore with the markets of the world. *The public character of the use to which the harbor structures are devoted is not affected by the fact that they may not all be made available for the indiscriminate use of the public.* By the allocation or lease of certain docks for the separate use of persons or corporations having a regular or continuous need of such conveniences, the city does not convert into a private use the public port service which is thus in part provided."
(Emphasis supplied.)

In *Riden v. Phila., B. & W. R. R. Co.,* *supra,* the right of the railroad to condemn the appellant's land for the purpose of constructing a branch line to a privately-owned business, Bowie Race Track, was at issue. The Court, while recognizing the difficulty in arriving at a single definition of "public use," applied the literal concept of actual use by the public in order to uphold the right to condemn the property. The Court also pointed out that concepts of what constitute a public use change, and that the mere fact that a particular type of enterprise is usually undertaken by private business does not exclude governmental exercise of the power of

eminent domain in undertaking a similar enterprise. In responding to criticism that the Maryland concept of "public use" was too broad and would enable the State to condemn property for various types of business enterprises, the Court stated (182 Md. at 342-343):

"The criticism was made ... that our construction of the words 'public use' would enable the State to condemn property for business enterprises such as hotels and theatres. ... 'But why,' demands one of the leading authorities on the subject in defense of the Maryland rule, 'may not the Legislature provide for acquiring by condemnation a site for a hotel or theatre to which the public shall have the right to resort and which shall be subject to public regulation in its management and charges? Is not this a mere question of expediency and public policy? And is not our opinion upon this question the outgrowth of the state of society in which we live and the usages and practices to which we are accustomed? In ancient times vast sums of money were expended in the construction and maintenance of public theatres, which were regarded as among the most important of public institutions. . . . Some discretion must be left to the Legislature. It is not to be presumed that they are wholly destitute of integrity or judgment. The people have left it for them to determine for what public uses private property may be condemned. If they abuse their trust, the responsibility is not upon the courts, nor the remedy in them.' 1 Lewis, Eminent Domain, 3d Ed., Sec. 258. In sustaining the Maryland Housing Authorities Law, the Court of Appeals, speaking through Chief Judge Bond, said that if the statute had provided for housing accommodations for persons other than those of low income, its constitutionality would have been questionable. Matthaei v. Housing Authority of Baltimore City, 177 Md. 506, 514, 9 A. 2d 835. Nevertheless, it is

now well known that the modern American city functions in the public interest as the proprietor and operator of many activities which were formerly carried on, and which in some instances are still carried on, by private enterprise."

As previously pointed out, the cases discussed above demonstrate that the constitutional term "public use" is not synonymous with physical use or access by the general public. In *New Central Coal Co.*, *Pitznogle*, and *Marchant*, the public had no right of access to the facilities for which the condemnations were sought. Furthermore, these cases, as well as *Riden*, show that merely because private businesses or private persons will also receive benefit from the condemnation does not destroy the public character of the action. Moreover, as the Court in *Riden* made clear, the fact that the government may be getting involved in an area which was formerly the domain of private enterprise does not require a conclusion that the taking is not for a public use. Finally, with respect to the principal factor apparently relied on by the court below, the public character of a condemnation is not necessarily changed because a private entity will own the property. In *New Central Coal Co.*, *Pitznogle*, and *Riden*, the condemnors were private corporations authorized by the State to exercise the power to condemn property. In *Marchant*, the property was to be leased to private businesses. *See also Flaccomio v. City of Baltimore*, 194 Md. 275, 71 A. 2d 12 (1950) (condemnation by the City of property which was to be turned over to a private museum); *Johnson v. Baltimore*, 158 Md. 93, 148 A. 209, 66 A.L.R. 1488 (1930) (condemnation by the City of land to be turned over to a private corporation operating the "Enoch Pratt Free Library"). And *see Herzinger v. City of Baltimore*, 203 Md. 49, 60-61, 98 A. 2d 87 (1953), where, in rejecting a challenge on Fourteenth Amendment grounds to the condemnation of property which was to be conveyed to private owners for redevelopment, the Court said:

"We think the fact that after the taking the property may be put into private hands does not

destroy the public character of the taking insofar as that taking may accomplish a proper public benefit."[4]

On the other hand, where the predominant purpose or effect of a particular condemnation action has been to benefit private interests, this Court has held that the taking is not for a "public use" within the meaning of Art. III, § 40, of the Maryland Constitution. For example, in *Van Witsen v. Gutman, supra,* Baltimore City had condemned a portion of a public alley for the purpose of selling it to Mrs. Gutman, a private owner of land adjoining the alley. Other landowners whose properties also adjoined the alley sought an injunction prohibiting Mrs. Gutman from erecting a wall on the portion of the condemned property which had been conveyed to her. They claimed that they had a right to use the alley and that they were being deprived of property by the city for a private use. The Court sustained their claim in the following words (79 Md. at 411-412):

"They [the other property owners] lose their easement in the closed portion, and she is thereby enabled to erect a building upon it. This is palpably and plainly taking their private property for her private use. In other words, it is a forced sale to her of their property. The extinguishment of their interests does not appear to enure in any way to the public service; nor to tend to the relief of any public necessity, nor to promote any public interest, nor to subserve any public purpose, nor to be connected with anything used by the public, nor, in short, to have any relation to the public convenience or public welfare. The Legislature has the power to

---

4. The condemnation in *Herzinger* was made under authority of Art. XI-B of the Constitution of Maryland, and thus was not specifically subject to the limitations of Art. III, § 40, of the Maryland Constitution. *See* Master Royalties v. Balto. City, 235 Md. 74, 84-85, 200 A. 2d 652 (1964). Nevertheless, the Court in *Herzinger* did not appear to regard the limitations imposed by § 40 as being different from the limitations imposed by the Due Process Clause of the Fourteenth Amendment, for the Court relied on § 40 cases such as *Flaccomio, Riden, Johnson* and *Marchant.*

direct that private property shall be taken for the public use, if just compensation be made in the manner prescribed by the Constitution. It lies in its discretion to determine to what extent, on what occasions, and under what circumstances this power shall be exercised. The Courts have no right to review or control its decisions on these points; but it is indispensable that the use for which private property is taken should be of a public nature."

In *Arnsperger v. Crawford, supra,* the County Commissioners of Frederick County, pursuant to a private road statute, took land belonging to the appellees and conveyed it to the appellant, for a private road to the appellant's land. The circuit court held that the statute authorizing the County Commissioners' action violated Art. III, § 40, of the Maryland Constitution, and this Court dismissed the appeal on jurisdictional grounds. The Court stated, however, that "[i]f we were authorized to decide the constitutional question in this case we should hold the statute unconstitutional." (101 Md. at 259.)

None of the cases in this Court applying Art. III, § 40, of the Maryland Constitution, have involved condemnations of land for industrial or commercial purposes in contexts other than those associated with railroads, public utilities, or port development.[5] However, governmental acquisition of land at the intersection of two major highways, to create a type of industrial development which was desired but not present in

5. The cases in other states involving condemnations of land for industrial or commercial purposes appear to be in conflict. *Compare* Boise Redevelopment Agency v. Yick Kong Corp., 94 Ida. 876, 499 P. 2d 575, 578-579 (1972); Housing and Redevelopment Authority v. Minneapolis Metropolitan Co., 259 Minn. 1, 104 N.W.2d 864, 870 (1960); Courtesy Sandwich Shop v. Port of N.Y. Authority, 12 N.Y.2d 379, 190 N.E.2d 402, 404-406, 240 N.Y.S.2d 1, *appeal dismissed,* 375 U. S. 78, 84 S. Ct. 194, 11 L.Ed.2d 141, *reh. denied,* 375 U. S. 960, 84 S. Ct. 440, 11 L.Ed.2d 318 (1963); Cannata v. City of New York, 11 N.Y.2d 210, 182 N.E.2d 395, 227 N.Y.S.2d 903, *appeal dismissed,* 371 U. S. 4, 83 S. Ct. 28, 9 L.Ed.2d 48 (1962), *with* City of Little Rock v. Raines, 241 Ark. 1071, 411 S.W.2d 486 (1967); Opinion of the Justices, 152 Me. 440, 131 A. 2d 904 (1957); Opinion of the Justices, 332 Mass. 769, 126 N.E.2d 795 (1955); Hogue v. Port of Seattle, 54 Wash. 2d 799, 341 P. 2d 171 (1959).

the County, for the purpose of. providing employment and general economic benefit to the County, does not seem very different from the condemnation of land upheld in *New Central Coal Co., Pitznogle* and *Marchant.* Moreover, in several cases we have held that the governmental issuance of bonds to provide funds for the financing of private industrial and commercial development is a "public purpose." *See, e.g., Wilson v. Board of Co. Comm'rs,* 273 Md. 30, 327 A. 2d 488 (1974) (issuance of county bonds to finance the installation of anti-pollution devices by a private industry located in the county); *Lerch v. Maryland Port Authority,* 240 Md. 438, 214 A. 2d 761 (1965) (issuance of revenue bonds by a state agency for the construction of an International Trade Center in which office space was to be leased to private businesses); *Frostburg v. Jenkins,* 215 Md. 9, 136 A. 2d 852 (1957) (City of Frostburg revenue bonds to purchase facilities for a private manufacturing company which had agreed to locate in the city).[6]

In light of the prior decisions by this Court, we conclude that the circuit court erred in holding that the condemnation here was not for a "public use." There has been no suggestion in this case that the purpose of the County's action is to benefit any particular private businesses or persons, such as was present in *Van Witsen v. Gutman, supra,* or *Arnsperger v. Crawford, supra.* Instead, the purpose is to provide for a type of industrial development believed by the County's elected officials to be needed in the County, which the private sector of the economy had failed to provide. The industrial park will, in the judgment of the State Legislature and the County officials, provide employment opportunities as well as general economic benefit for the residents of Prince George's County. To say that Prince George's County may not accomplish these

---

6. While we recognize that the exercise of the eminent domain power and the issuance of governmental bonds are different types of governmental action, it is noteworthy that cases involving the former type of action have relied on cases involving the latter and vice versa. *See, e.g.,* Lerch v. Md. Port Authority, *supra,* 240 Md. at 450-451; Frostburg v. Jenkins, *supra,* 215 Md. at 16; Flaccomio v. City of Baltimore, *supra,* 194 Md. at 278-279; Johnson v. Baltimore, *supra,* 158 Md. at 104.

purposes by condemning land for the establishment of certain desired types of private businesses in an industrial park along its major highways, whereas the City of Baltimore can accomplish the same purposes by condemning land for private businesses along its waterway (*Marchant v. Baltimore, supra*), would be wholly illogical. Under our cases, projects reasonably designed to benefit the general public, by significantly enhancing the economic growth of the State or its subdivisions, are public uses, at least where the exercise of the power of condemnation provides an impetus which private enterprise cannot provide.

> *Judgment of the Circuit Court for Prince George's County reversed, case remanded for further proceedings consistent with this opinion.*
> *Costs to be paid by the appellee.*