## PERELLIS ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 99, October Term, 1947.]

*Decided February 20, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Eli Frank, C. Warren Colgan* and *Reuben Oppenheimer*, with whom were *Frank, Skeen & Oppenheimer, Howard H. Conaway, Sidney A. Needle* and *Pierson & Pierson* on the brief, for the appellants.

*Simon E. Sobeloff, City Solicitor,* with whom were *Lester H. Crowther, Deputy City Solicitor,* and *Lloyd G. McAllister, Assistant City Solicitor,* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Baltimore City dismissing two bills of complaint which challenged, on constitutional grounds, the validity of an ordinance of the Mayor and City Council of Baltimore closing a portion of Benefit Street, a public highway of Baltimore City.

Benefit Street is a street or alley, 20 feet wide, running east and west between and parallel to Bank Street on the north, and Eastern Avenue on the south. The only entrance to Benefit Street is from Eaton Street on the west, running thence to a point about 250 feet from Eaton Street, where it ends abruptly and does not continue through to Grundy Street on the east, although there seem to be footways from that point to both Bank Street and Grundy Street. There are three one-story concrete block garages between the end of Benefit Street and Grundy Street. About midway of Benefit Street on its south side, there is a three-story brick building

owned by the partnership of L. Epstein and Sons (herein-after referred to as Epsteins) which fronts on Eastern Avenue. Directly across Benefit Street, on its north side, is another three-story brick building owned by Espteins, fronting on Bank Street. The two buildings are joined on the second floor by a bridge. A storm door also extends for some 53 inches into the street from the south side narrowing the street at that point to less than 16 feet. Epsteins also own a vacant lot on the north side of Benefit Street between the last mentioned build-ing and the eastern end of Benefit Street presently used by them as a parking lot for their customers.

On November 23, 1945, the Mayor and City Council of Baltimore entered into an agreement with L. Epstein and Sons reciting that Epsteins "desire to construct and erect a building on and across" Benefit Street "to con-nect portions of their stores for the convenience of the public using their stores"; that Epsteins have requested the City to open and then to close the portion of the street between their stores and have agreed to provide, at their own cost and expense, a new highway 20 feet wide from .Bank Street across the vacant lot owned by them, along-side an 8 foot right of way now owned by the City and curving into Benefit Street at its eastern terminus. The City agreed to introduce an ordinance authorizing it to convey to Epsteins in fee simple the portion of the high-way so closed, in exchange for the fee-simple title to the proposed new highway. The Epsteins agreed to pay the City all costs and expenses in connection with the transaction, and save the City harmless from all suits, claims or damages.

To implement this agreement, two ordinances were in-troduced in the City Council and enacted into law on February 4, 1946. The first ordinance, which was "a part of the plan or scheme of the whole project", had for its object the condemnation of the portion of Bene-fit Street between the two stores of Epsteins, so that the City might acquire a fee-simple title thereto, and the second had for its object the closing of such portion,

preliminary to a conveyance thereof from the City to Epsteins. The effect of the plan, if carried out, would be to cut Benefit Street into two portions, and create two cul-de-sacs, one between Eaton Street and the proposed new building, and one running from Bank Street to the eastern end of Benefit Street and thence to the east side of the proposed new building. Benefit Street would thus become a "dead end" street both to the east and west of the proposed new building.

The complainants are the owners or lessees of store properties to the east of the proposed new building, abutting on the south side of Benefit Street (including a 5 and 10 cent store, and a store selling refrigerators and washing machines), and a mortgagee of premises to the west of the proposed new building, abutting on Benefit Street. The bills attacked the validity of the second ordinance above mentioned, and sought declaratory relief. The City filed answers to both bills.

In an extended hearing, the complainants produced testimony tending to show that the proposed closing of the central portion of Benefit Street and the conveyance thereof to Epsteins would interfere with the access of customers and delivery trucks to their properties, which front on Eastern Avenue, a heavily congested traffic artery, and substantially reduce the business use and value of their properties. The City produced testimony tending to show that the situation, with respect to delivery access, would be somewhat improved by the alterations. The plan was approved by the City Planning Commission, the Fire Department, the Police Department, and the Highways Engineer.

Mr. Lang, secretary to the Planning Commission, testified that it would be preferable to have Benefit Street open at both ends. It was shown that one of the "rules and regulations" of the Planning Commission provided that "cul-de-sacs will be permitted only for residential use, and only in special cases where the topography and conditions render the provision for a street connection impracticable, * * *"; but the witness explained that

this rule applied only to new subdivisions. He pointed out that to open Benefit Street by way of Bank Street, or Grundy Street, without closing the central portion of Benefit Street, would involve the cost of condemning the necessary land, or land and buildings, whereas the proposed plan would cost the City nothing. He testified that the proposed plan would be an improvement over existing conditions, in that each of the new cul-de-sacs would be shorter than the existing one, and to that extent would improve access and relieve traffic congestion. He also pointed out that the new entrance from Bank Street would be 8 feet wider than Benefit Street, although vehicles making deliveries to the eastern end of Benefit Street would have to negotiate a curve.

Other witnesses, representing the Highways and Fire Departments, testified that the plan would improve access by trucks and fire equipment. It was admitted that the existing congestion in Benefit Street was due in large part to the storm door, erected by Epsteins without authority from the City, and to various poles carrying overhead wires along the north side of Benefit Street, erected by or with the approval of the City. On the other hand, it was testified that the existing congestion would be worse, but for the fact that delivery trucks made a practice of turning, at the dead end of Benefit Street, on the parking lot owned by Epsteins. The chancellor found that the ordinance was "one element of a plan adopted by the proper City officials who had authority to improve traffic conditions" and that "the improvements to be made are for a public use and purpose, which justifies the exercise of the power of eminent domain".

It is contended by the appellants that the closing of the central portion of Benefit Street, as distinguished from the opening of a new highway into Bank Street, constitutes a taking of the private property of the appellants in a constitutional sense, and that the highway can be closed only if the closed portion will be devoted to a public use. On the other hand, it is contended by the

appellees that the plan must be sustained as an exercise of the charter power granted to the City to open and close streets, unless it can be found as a fact that the plan bears no relation to the promotion of the public welfare or convenience, as distinguished from the convenience of abutting owners. We think all of these contentions are somewhat wide of the mark.

The contention that abutting property owners have an easement in an existing way, over and above the rights of the general public, was squarely presented and decided by this court in *Krebs v. State Roads Commission,* 160 Md. 584, 592, 154 A. 131, 135. In that case the relocation of a highway incident to the elimination of a grade crossing (admittedly a public purpose) left the property of the complainant in a cul-de-sac. This court, speaking through Chief Judge Bond, said: "Owners of property along the highway near the crossing probably all suffer from the surrender of the public easement at that site. * * * It could not be said that the property of any of these users—at least property not actually deprived of all access—is to be taken, unless it can be said that the location of the public easement at that site gave them superimposed property rights against the public as a whole. And this, we think, it did not do. * * * Their right [to use the way] has been only that secured to the public as a whole, even though by reason of the location of their properties it is of greater usefulness to them than to others of the public. * * * The inconvenience and loss, we think, cannot be considered as other than injuries incidental to the removal [of the grade crossing], or consequential upon it." See also *Mayor and City Council of Baltimore v. Himmelfarb,* 172 Md. 628, 192 A. 595, and *Brehm v. State Roads Commission,* 176 Md. 411, 5 A. 2d 820, 6 A. 2d 378.

We have held that the words "public use", in Art. 3, § 40 of our constitution "mean use by the public". *Riden v. Philadelphia B. & W. R. R.,* 182 Md. 336, 342, 35 A. 2d 99, 102. But that case dealt with the condemnation of privately owned land, not the closing and disposal of an

existing way. Compare *Arnsperger v. Crawford,* 101 Md. 247, 61 A. 413, 70 L. R. A. 497. If the closing of a highway is a necessary incident to a public improvement, the fact that the closed portion is thereafter devoted to a private use does not render the closing invalid. "The fact that as a consequence of closing of the street, private ownership in its bed results, and that provisions are made by the law by which the land can be utilized and rendered valuable, does not convert the main purpose of the legislature from a public to a private one." *Mayor & City Council v. Brengle,* 116 Md. 342, 350 81 A. 677, 680. See also *Marchant v. Baltimore City,* 146 Md. 513, 126 A. 884; *Pitznogle v. Western Maryland R. Co.,* 119 Md. 673, 87 A. 917, 46 L. R. A., N. S., 319; *Jenkins v. Riggs,* 100 Md. 427, 59 A. 758 and *Riggs v. Winterode,* 100 Md. 439, 59 A. 762.

On the other hand, it is fundamental that private property cannot be taken for private purposes. As Chief Judge Alvey has said: "Whether the use, in any particular case, be public or private is a judicial question; for otherwise, the constitutional restraint would be utterly nugatory, and the Legislature could make any use public by simply declaring it so, and hence its will and discretion become supreme, however arbitrarily and tyranically exercised." *New Central Coal Co. v. George's Creek C. & I. Co.,* 37 Md. 537, 560. Abutting owners have at least a special property interest in the highway sufficient to invoke the aid of a court of equity to prevent an illegal closing for private purposes. "The highways, streets and alleys of the city are held and controlled by it as avenues of communication for the whole public, and not to be hired or rented to private persons for revenue. In this case the appellants, as members of the general public, were entitled to the use of the street from end to end and from side to side * * *, and as abutters they had a private interest in it as a means of access to their property distinct from that of the general public * * *." *Huebschmann v. Grand Company,* 166 Md. 615, 628, 172 A. 227, 233. It was there held that a per-

mit from the City to extend a building into the street was invalid as a grant to "a private person, for its own peculiar and private benefit". Page 629 of 166 Md., page 233 of 172 A.

In *Van Witsen v. Gutman,* 79 Md. 405, 29 A. 608, 610, 24 L. R. A. 403, an ordinance was passed closing a portion of an alley immediately in the rear of Mrs. Gutman's store, so as to permit her to extend her corner store over the portion of the alley so closed. At the same time she entered into an agreement with the City whereby she agreed to pay all costs involved and to grant the City a strip of land 7 feet wide by 27 feet in length to enlarge the portion of the alley not closed, so as to provide a 25 foot turning space for vehicles entering the cul-de-sac thus created. The court said: "The extinguishment of their [abutting owners] interests does not appear to inure in any way to the public service; nor tend to the relief of any public necessity, nor to promote any public interest, nor to subserve any public purpose, nor to be connected with anything used by the public, nor, in short, to have any relation to the public convenience or public welfare. * * * Whether the use is public or private is a question for the judiciary to decide." The ordinance was held invalid.

In *Townsend, Grace v. Epstein,* 93 Md. 537, 49 A. 629, 632, 52 L. R. A. 409, 86 Am. St. Rep. 441, an ordinance authorized the building of an enclosed superstructure or bridge across an alley. In holding it invalid as a deprivation of light and air, this court said: "The Corporation, the Mayor and City Council of Baltimore, is invested with the title to and control over the public streets. This control, however, is not an arbitrary control. The streets and highways are held in trust for the benefit, use and convenience of the general public. * * * It is not in accord with the trust upon which the municipality holds the streets, nor with the nature of the control which it has over them to make use of the power and authority with which it is invested in that regard to promote a mere private purpose, to subserve a mere private interest or to

subordinate the right of one citizen in the streets, or in a street of the City to the private interest and convenience of any other."

In the case at bar, we think it is manifest that the closing of the central portion of Benefit Street is designed solely for the private advantage of Epsteins. Such closing will substantially impair the access which the complainants presently enjoy. The fact that another means of access is provided, as good or better for some purposes, is not controlling. The decisions in the *Gutman* and *Huebschmann* cases, *supra,* did not turn upon a balance between damage from loss or impairment of the existing means of access and benefit from any alternative means. The private purpose vitiated the entire transaction as to the property owners damaged.

In the instant case, the plan proposed is clearly not the best solution of the traffic problem. It is conceded that the public interest would be better served by opening Benefit Street at its east end, so as to make it a through street. The plan is supported by the City authorities on the ground that it will provide access for trucks and other vehicles somewhat better than the existing access, but primarily on the ground that the entire cost will be borne by the proponents of the change, rather than by the taxpayers in general, or by those specially assessed for benefits.

Cost is always a proper consideration, and a particular choice of location is not to be condemned merely because persons specially benefited may agree to pay the cost, in whole or in part. But the choice must be made upon considerations of public benefit, and not by barter and sale to private interests, otherwise the location of the highways would be in the hands of the highest bidders. While the courts cannot pass upon questions of policy, they must determine from the facts of each case presented whether the primary purpose or effect is public or private.

In the instant case, we hold that the proposed closing of the central portion of Benefit Street is solely for the private use and advantage of Epsteins. This is the neces-

96

sary effect of the closing, and further benefit from the opening of the eastern end of Benefit Street cannot change the private nature and effect of the closing. Indeed, the opening of the connection to Bank Street, which is clearly in the public interest, is almost wholly nullified by the closing of Benefit Street. The fact that such closing will pay for the new connection does not make lawful what would otherwise be clearly unlawful. In the light of our prior decisions, we must hold that the ordinance is invalid.

*Decree reversed, with costs.*