21 A.3d 1116

APPLETON REGIONAL COMMUNITY ALLIANCE, et al.

v.

BOARD OF COUNTY COMMISSIONERS
OF CECIL COUNTY, Maryland.

No. 137, Sept. Term, 2009.

Court of Appeals of Maryland.

June 21, 2011.

J. Carroll Holzer (Holzer & Lee, P.A., Towson, MD), on brief, for appellants/cross-appellees.

Richard A. DeTar (Lawrence F. Haislip and Steven J. Kelly of Miles & Stockbridge P.C., Easton, MD), on brief, for appellee/cross-appellant.

Argued before HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA, JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

MURPHY, J.

This appeal from the Circuit Court for Cecil County requires that we interpret Md. Ann.Code *art.* 25, § 8(a) which, in pertinent part, provides:

(a) ... [T]he County Commissioners of Cecil County, in addition to, but not in substitution of, the powers which may have been or may hereafter be granted them, shall have the full power and authority to acquire by lease, purchase or condemnation real or leasehold property needed for any public purpose and to erect buildings thereon for the benefit of the county and to sell at public or private sale or lease any real or leasehold property belonging to the county when in their discretion it is no longer needed for public use, and to execute and acknowledge any and all deeds and/or other instruments necessary to effect and complete such lease, purchase or sale of real or leasehold property[.]

Appellants are residents of Cecil County who argue that the above quoted statute prohibits the Board of Cecil County Commissioners (the Board), Appellee, from selling County owned water and wastewater facilities to the company that has been granted a franchise to provide water services. The Circuit Court for Cecil County rejected that argument in a Memorandum Opinion that concluded as follows:

The Board of Cecil County Commissioners have properly determined that the water and wastewater Facilities are no longer needed for public use by Cecil County and should not continue to be owned and maintained by the County as

county-owned property. In doing so, the Commissioners have not exceeded their discretionary authority as permitted by Article 25, § 8(a), by the enactment of the Resolutions on October 7, 2008 providing for the sale of the Facilities to Artesian, a privately owned, publicly regulated utility company, for the continued use and benefit of the citizens of Cecil County.

After Appellants noted a timely appeal to the Court of Special Appeals, both Appellants and Appellee filed Petitions for Writs of Certiorari. We granted those petitions. 411 Md. 598, 984 A.2d 243 (2009).

Appellants argue that we should answer "no" to the following question:

Whether Annotated Code of Maryland, Article 25 § 8(a) authorizes the Cecil County Commissioners to sell operating County water and wastewater facilities as "no longer needed for public use" when they must continue to be operated by the new owners as water and wastewater facilities or revert to County ownership and operation?

The Board argues that the question should be rephrased as follows:

Does the "Public Need Test" as set forth in Article 25, Section 8(a) and clarified in *South Easton Neighborhood Association ("SENA"), Inc., et al. v. Town of Easton, Maryland,* 387 Md. 468, 876 A.2d 58 (2005), permit the Commissioners to convey County-owned water and wastewater facilities to privately owned, publicly-regulated utilities, when the Commissioners determined they no longer needed to own the facilities because they previously granted exclusive water and wastewater franchises to those companies exclusively to provide water and wastewater services in the area served by the facilities?

For the reasons that follow, we shall hold that *art.* 25, § 8(a) does not prohibit the Board from conveying the property at issue. We shall therefore affirm the judgment of the Circuit Court.

## Background

In a Memorandum Opinion filed on April 30, 2009, the Circuit Court stated:

The operative facts are relatively simple. On August 19, 2008, the Board of County Commissioners of Cecil County (the "Board" or "County") voted to grant a water services and a wastewater franchise to Artesian Water Maryland, Inc. and Artesian Wastewater Maryland, Inc., respectively (for ease of reference, both companies are referred to collectively as "Artesian"). On September 18, 2008, Petitioners, Appleton Regional Community Alliance, et al. ("Appleton"), filed the initial petition for judicial review of the decision of the County[.]

On October 7, 2008, the Board approved additional resolutions and a related Asset Purchase Agreement (the "Agreement") that provides for the sale and transfer to Artesian of various county-owned water and wastewater facilities, along with associated parcels of real property, easement rights, and other water and wastewater system assets. On November 4, 2008, Appleton filed a second petition for judicial review specifically addressing the purposed transfers of county property and assets[.]

The Franchise Agreements include the following provisions:

## Agreement

NOW, THEREFORE, in consideration of the County's grant of the Franchise to Franchisee, and Franchisee's contractual undertaking to provide Water Service to Customers in the Franchise Area pursuant to and consistent with Applicable Laws, pursuant to the terms, covenants, conditions and restrictions set forth in this Agreement, and other good and valuable consideration, the receipt and the adequacy of which are hereby acknowledged, the County and Franchisee agree as follows.

\* \* \*

3 GRANT OF FRANCHISE; LIMITS AND RESERVATIONS.

### 3.1 Generally.

(b) Franchisee and County shall execute a definitive agreement for the transfer of the County's water facilities within the Service Area as described in Exhibit A from the County to Franchisee in accordance with the terms reflected in the Letter of Intent at Exhibit F.

\*     \*     \*

### 11.1 County Approval of Transfer of Control Required.

(a) No Transfer of Control of Franchisee may occur without the prior written consent of the County.

(b) No Transfer of Control of the Franchise may occur without the prior written consent of the County.

### 11.2 Other Actions Affecting Franchise

(a) Franchisee shall not enter into any agreement or contract with any Person which materially affects Franchisee's performance of its obligations under the Franchise and this Agreement, or abandon or discontinue the exercise of the Franchise, and the operation of the Water System within the Franchise Area, as a whole or in part, without the prior written consent of the County.

\*     \*     \*

12.1 Termination Events. This Franchise and Agreement may be terminated in any one of the following circumstances (each a "Termination Event").

(a) Upon expiration of the Term, if no further Extension Term exists or if Franchisee shall have failed or refused to exercise its right and option to renew this Agreement and the Franchise for an Extension Term, then this Agreement, the Franchise and Franchisee's right to provide Water Service in the Franchise Area shall terminate subject to Applicable Laws.

(b) Prior to the stated expiration date of the Term, as to all or part of the Franchise, the Franchise Area and the rights and obligations of the parties under this Agreement, upon application by Franchisee to the County in accordance with Section 11.2(a), and following application to and ap-

proval of such action by the Commission, as provided in § 5–202 of the PUC Article and Section 11.3(b).

(c) Prior to the stated expiration date of the Term, upon request by the County to Franchisee, and with the consent of Franchisee, and following application to and approval of such action by the Commission, as provided in § 5–202 of the PUC Article and Section 11.3(b).

(d) Upon action by the Commission, in exercise of its powers under the PUC Article, to suspend or revoke Franchisee's right to exercise the Franchise and to operate the Water System.

(e) By the County, following a Default by Franchisee, and as provided in Section 12.2.

(f) By the County, without regard to the existence of a Breach or a Default, in connection with the County's exercise of its reserved rights under Section 3.8 and § 67–6 of the County Code.

\*     \*     \*

12.4   Effect of Termination—Expiration of Term.

If the Franchise and this Agreement expire as provided in Section 12.1(a) then the Water System shall be transferred and conveyed by Franchisee and acquired by the County free of all liens and encumbrances; and Franchisee shall be bound to execute such further assurances of the conveyance of title as the County shall deem reasonable.  The County shall pay Franchisee the Fair Market Value for the Water System, as and when conveyed to the County.  The County and Franchisee shall be bound to cooperate with one another and to exercise due diligence to effectuate the sale and transfer.

12.5   Effect of Termination—by Agreement.

If the Franchise and this agreement are terminated as provided in Section 12.1(b) and Sections 12.1(c) then the Water System shall be disposed of between the parties on such price and terms as they shall agree.

12.6   Effect of Termination—Default.

If the Franchise and this Agreement are terminated as provided in Section 12.1(d) or Section 12.1(e), then the Water System shall be transferred and conveyed by Franchisee and acquired by the County free of all liens and encumbrances; and Franchisee shall be bound to execute such further assurances of the conveyance of title as the County shall deem reasonable. The County shall pay Franchisee the Adjusted Rate Base for the Water System, as and when conveyed to the County. The County and Franchisee shall be bound to cooperate with one another and to exercise due diligence to effectuate the sale and transfer.

12.7   Effect of Termination—Taking.

If the Franchise and this Agreement are terminated as provided in Section 12.1(f) then the Water System shall be transferred and conveyed by Franchisee and acquired by the County in accordance with the provisions set forth in § 67–6 of the County Code. The Water System shall be transferred and conveyed by Franchisee and acquired by the County free of all liens and encumbrances; and Franchisee shall be bound to execute such further assurances of the conveyance of title as the County shall deem reasonable. The County shall pay Franchisee the Fair Market Value for the Water System, as and when conveyed to the County. The County and Franchisee shall be bound to cooperate with one another and to exercise due diligence to effectuate the sale and transfer.

The Asset Purchase Agreements include the following provisions:

**Section 2.3   *Liabilities***

(a) Assumed Liabilities.   At the Closing, the Buyer will assume Liability for and agree to pay, perform, and discharge, in a timely manner and in accordance with the terms thereof, all of the following (collectively, the "Assumed Liabilities"):

(i) all obligations and responsibilities to provide water transmission and distribution services to the Service Area arising from and after the Closing . . .

*     *     *

**Section 4.5** *Real Estate*

... (c) To the County's Knowledge, the Owned Real Property, the Leased Property, and Easements comprise all of the real property interests necessary for the Buyer to operate the Facilities and the Water Transmission and Distribution Systems after the Closing as they are each presently being conducted by the County and they will each be conducted by the County on the Closing Date.

\* \* \*

**Section 6.1** *Conduct of Business Pending Closing.*

Except as set forth in Schedule 6.1 or as may be first consented to by the Buyer in writing, during the period from the date of this Agreement through and including the Closing Date, the County shall conduct the operations of the Facilities, the Water Transmission and Distribution Systems and other Purchased Assets according to its ordinary and usual course of business and preserve intact the Purchased Assets and will not sell, lease, transfer, assign, or convey any Purchased Assets, amend modify, cancel or terminate any Assumed Contract, will not amend any Tax Return and will otherwise maintain satisfactory relationships with respect to the Purchased Assets with other Governmental Authorities, Suppliers, agents, Customers, and others having relationships with the County in respect of the operations of the Facilities, the Water Transmission and Distribution Systems or the other Purchased Assets.

The Circuit Court granted the Board's motion for summary judgment on the issue of its right to award the Franchise Agreements on the ground that, "the Board's award of a franchise to operate a water and wastewater system to a private concern ... is clearly a planning action ... and is not judicially reviewable as a quasi-judicial proceeding." After denying the Board's motion for summary judgment on the issue of whether it had a right to sell the County owned property, the Circuit Court ultimately concluded that the County did have a right to do so. In a Memorandum Opinion filed on July 27, 2009, the Circuit Court stated:

Indeed, there can be little doubt that the Facilities, which provide necessary services of the County, are and will continue to be needed and operated for public purpose and benefit. It therefore becomes necessary to examine the language and intent of Article 25 § 8.

\* \* \*

. . . . The question then, is whether the legislative discretionary power and authority of the Commissioners is so limited that it applies solely to property no longer needed for any public use, such as surplus property. . . . However, the statute can certainly be construed to permit the sale of property used by the public, but not *necessary* for public use, such as a street or alley, or a portion thereof, where other means of access may be available. *Inlet Assoc. v. Assateague House Condo. Assn., et al.*[,] 313 Md. 413[, 545 A.2d 1296] (1987).

\* \* \*

Both Parties rely on the Court of Appeals decision in *South Easton Neighborhood Association, Inc., et al. v. Town of Easton, Maryland,* 387 Md. 468[, 876 A.2d 58] (2005) (*"SENA "*). The Court in *SENA* rejected the proposition that because a certain street in Easton (Adkins Avenue) was in continued use by the public, that in and of itself would foreclose the Town of Easton's discretionary authority to close the street and sell the right-of-way to a hospital under Article 23A, § 2(b)(24). The Court observed, "[r]ecognizing an absolute no-use standard would permit one person to walk the length of Adkins Avenue, or any other public right of way, and thereby foreclose any conveyance of the roadbed, regardless of the Town Council's legislative determinations." (*Id.* at 495 [876 A.2d 58] ). This, of course, would tend to undermine Petitioners' contention that "no longer needed for public use" equates to a finding that the property must be surplus. In *SENA* there was ample evidence that the public had access to and continued to use the subject street on a daily basis, even though it was not the sole means of access for various

property owners in the vicinity. Thus, the continued public use argument had failed to persuade the Court of Appeals that a legislative decision of the Town of Easton to transfer the roadbed in Easton Memorial Hospital was somehow an abuse of discretion under Article 23A, § 2(b)(24).

\* \* \*

Here, the County, in the exercise of its statutory discretion, made a legislative determination that: a) it would franchise the operation of its water and wastewater systems to a private entity, and b) it no longer needed the subject property for the existing public use and would convey it to the private entity, consistent with the franchise award to operate those water and wastewater systems for the continued public benefit.

\* \* \*

It has already been determined that the County, in the proper exercise of its legislative function may grant a franchise to a private entity to provide water and wastewater services to its citizens. As the County now suggests, that made superfluous the continuing "public use" of the facilities by the County by its lawful action in granting the franchises to Artesian.

In a practical sense, the Facilities to be transferred are in fact no longer needed for the public use *by Cecil County.* Artesian, by providing, among other things, the personnel, administration, necessary upkeep and capital improvements, engineering expertise and flexibility as to discharge credits, as well as assuming major liabilities and obligations providing a financial benefit to the County, will essentially remove the existing water and wastewater facilities from the County needs inventory, even though the Facilities will continue to be maintained for a public use, purpose and benefit to the citizens of Cecil County. The question is whether Article 25, § 8 imposes a narrow limitation on the discretionary authority of the Commissioners to a degree that they may not sell or lease property to a private entity if the property continues to be maintained for public use, benefit and

purpose. Although the [Appellants] seek to distinguish the holding in *SENA* from the instant matter as public property "no longer needed for public use" as opposed to public property "*still* needed for public use," this Court does not interpret *SENA* to represent such a limitation on the discretionary authority of the Board of Commissioners. Indeed, the *SENA* court reasoned that the street bed to be transferred would continue to be used for a public purpose and benefit as a hospital, facilitating emergency and outpatient care services. *Id.* at 499 [876 A.2d 58]. Although the particular public purpose and benefit may have changed, the property nevertheless continued to be maintained for a public use, benefit and purpose. Accordingly, the [Appellants'] position is without merit.

(Emphasis in original. Footnotes omitted).

The record includes a JOINT STIPULATION that "Appellants now challenge only those portions of the Franchise Agreements and attachments thereto that provide for, or relate to, the sale and transfer of County water and wastewater assets[.]"

## Discussion

Although they concede that the Board is expressly authorized by *art.* 25, § 3D(b) to grant franchises for "water and sewerage systems in order to assure delivery of [such] services to its citizens, to avoid duplication of facilities, . . . and to promote the general health and welfare by providing for adequate water and sewerage systems," Appellants argue that the Board is prohibited by *art.* 25, § 8(a) from selling facilities that will *continue* to provide essential services to the citizens of Cecil County. According to Appellants, the Board does not have authority to sell county property pursuant to a transaction in which (a) the County has granted a water and wastewater services franchise to a private company; (b) the property will be sold to the franchisee, who will continue to use the property to provide the very same essential services to the citizens of Cecil County, and (c) the County has a right to reenter the property and resume providing the same public

services that it had been providing prior to the sale.  According to the Board, however, in the words of its brief:

> The Public Need Test requires that two findings be apparent from the record:  first, that the governing body has identified and considered the existing public use property in question;  and second, that the governing body has determined that it no longer needs to own and operate that property for the existing public use. *See SENA,* 387 Md. at 489, 876 A.2d at 71.... The facts of this case are on all fours with *SENA.*

As we apply the well settled principles of statutory interpretation to these arguments, we (1) attempt to harmonize the Board's statutory authority to grant water and wastewater franchises with the Board's "additional" statutory authority to sell property when, in the Board's "discretion," the property is no longer needed for public use, (2) presume that the legislature intended that both *art.* 25, § 3D(b) and *art.* 25, § 8(a) would operate together as a consistent and harmonious body of law, and (3) avoid a construction that is unreasonable, illogical, or inconsistent with common sense. *See, e.g., Condon v. State of Maryland–University of Maryland,* 332 Md. 481, 491–92, 632 A.2d 753, 757–58 (1993); *Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007).

We are persuaded that *art.* 25, § 3D(b) and *art.* 25, § 8(a) can be harmonized.  As we see it, *art.* 25, § 8(a) is an express grant of "additional" authority to the Board.  We therefore disagree with the argument that *art.* 25, § 8(a) prohibits the Board from exercising the "discretion" that was exercised in the case at bar.  As the Court of Special Appeals has stated, "discretion signifies choice.  Consideration of the various elements of the problem does not preordain a single permissible conclusion." *Hart v. Miller,* 65 Md.App. 620, 625–26, 501 A.2d 872, 875–76 (1985). *Art.* 25, § 3D(b) authorized the Board to grant the franchises, as well as to take appropriate action in order to "avoid the duplication of facilities," while *art.* 25, § 8(a) provided the Board with the discretion to structure the transaction for maximum public benefit.

As to the issue of whether Appellants' interpretation of *art.* 25, § 8(a) is unreasonable, the Board argues, in the words of its brief:

Appellants would permit the Commissioners the power to grant exclusive franchises to Artesian but would deny them the statutory authority to convey the very systems which would allow Artesian to carry out the services attendant to those franchises. Further, having granted lawful water and wastewater Franchises within the franchise area, the County would be constrained to own and to operate Facilities, "for public use," *in perpetuity,* in effect *creating two operating and competing water and wastewater systems within the same geographic area.* The statute cannot, it should not, and it need not be read to create such an implausible result. *See Dickerson v. State,* 324 Md. 163, 171, 596 A.2d 648, 652 (1991) (recognizing that statutes should generally be interpreted to produce "reasonable" rather than "absurd" or "extraordinary" results).

(Emphasis in original). We agree with this argument. It would be unreasonable and illogical to hold that, although expressly authorized to grant the franchises, the Board is prohibited by *art.* 25 § 8(a) from performing its duty "to avoid the duplication of [water and sewerage] facilities."

For the reasons stated above, we hold that *art.* 25, § 8(a) does not prohibit the Board from entering into the Asset Purchase Agreements at issue. We shall therefore affirm the judgment of the Circuit Court.

**JUDGMENT OF THE CIRCUIT COURT AFFIRMED; APPELLANTS TO PAY THE COSTS.**

HARRELL, BATTAGLIA and GREENE, JJ., Dissent.

HARRELL, J., dissenting, in which BATTAGLIA and GREENE, JJ., join.

I dissent. In reaching its holding "that *art.* 25, § 8(a) does not prohibit the Board from entering into the Asset Purchase Agreements at issue," 420 Md. 172, 184, 21 A.3d 1116, 1123 (2011) the Majority opinion reads the phrase "no longer

needed for public use" out of the applicable Maryland statute in its attempt to "harmonize" Maryland Code (1957, 2005 Repl.Vol.), Art. 25 § 8(a) with Art. 25 § 3D(b). The Majority's succinct analysis disregards, by failing to analogize, distinguish or otherwise address, this Court's 2005 decision in *South Easton Neighborhood Ass'n, Inc. v. Town of Easton ("SENA")*, 387 Md. 468, 489, 876 A.2d 58, 71 (2005), which considered a similar provision of the Maryland Code. Application of *SENA* to the facts and relevant statutory law of the present case compels the conclusion that the Board of County Commissioners of Cecil County, Maryland, does not have the authority to sell the water and wastewater facilities at issue, as the facilities are, and continue to be, "needed for public use."

## I. *Background*

In August 2008, the Board of County Commissioners of Cecil County, Maryland ("the Board") granted franchises, through certain "Franchise Agreements," to Artesian Water Maryland, Inc. and Artesian Wastewater Maryland, Inc. (collectively "Artesian") for exclusive rights to provide water and wastewater services in the "Original Elkton West Service Area," which did not have its own service facilities. Both Artesian entities are privately-owned, for-profit, water utility companies. Art. 25 § 3D(b), among other things, gives the Board the authority to grant one or more franchises for water and/or wastewater systems. The Franchise Agreements contemplated the expansion of the service area, as well as a sale of the facilities within the expanded area.

Pursuant to Art. 25 § 8(b), the Board held a public hearing on 30 September 2008, which was advertised in The Cecil Whig, a local newspaper, two weeks prior to the hearing. At this hearing, a member of the Cecil County Chamber of Commerce testified that the transfer would benefit the County and its residents by freeing-up capital and wastewater discharge credits, as well as reducing county debt and taxpayer subsidies. Certain county residents questioned, however, the authority of the Board to sell the land, arguing it was needed

for public use, quoting Art. 25, § 8(a), which states that the Board may sell property when it is "no longer needed for public use[.]" These taxpayers also noted concerns regarding rate increases and service level decreases. In response to the citizens' questions and complaints, a member of the Board stated merely that it has "plenary power under Article 25, Section 8 of the Code to sell and convey real property when [the Board] deem[s] it to be in the public interest to do so." Not once did any of the members of the Board address the requirement that the property be "no longer needed for public use." Following this hearing, the Board adopted three resolutions, in October 2008, approving the Asset Purchase Agreements, effectuating the expansion and sale of the facilities. Members of the community, joined as Appleton Regional Community Alliance ("Appleton"), filed a petition which sought, among other things, to enjoin the Board from selling the facilities.

## II. *Applicable Law*

The relevant provisions of the Maryland Code are Art. 25, § 3D(b) and Art. 25, § 8(a). Section 3D provides county commissioners the power to "displace or limit competition" in certain sectors, such as public transportation, water and sewerage, and publicly-owned or leased lands. Subsection (b) states:

(1) It has been and shall continue to be the policy of the State to authorize the county commissioners of each county to displace or limit competition in the area of water and sewerage systems in order to assure delivery of adequate, economical, and efficient services to its citizens, to avoid duplication of facilities, and to provide for the health and safety of its citizens. . . .

(2)(i) The county commissioners of each county have the authority to grant one or more franchises or enter into contracts for water and sewerage systems on exclusive or nonexclusive basis to any person. . . .

§ 3D(b). Section 8(a) grants additional powers to the Board specifically to purchase and sell public land. The board may

"sell at public or private sale or lease any real or leasehold property belonging to the county when in their discretion it is no longer needed for public use . . . ." § 8(a).

The Legislature acted presumably with full knowledge of the interplay between these two sections and their respective policy implications. *See Bd. of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982) ("The General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law."). To the extent that two statutes are vague or ambiguous, it is well-settled that they should be read together, within the entire statutory scheme, to ascertain the true intention of the Legislature in a way that will not lead to absurd consequences. *See Mayor of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 549–51, 814 A.2d 469, 491 (2002) ("[W]e interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted. Such an interpretation must be reasonable and consonant with logic and common sense."). Further, courts must ensure that no word or phrase is "rendered surplusage, superfluous, meaningless, or nugatory." *Lendo,* 295 Md. at 63, 453 A.2d at 1189; *see also Hurst v. V & M of Virginia, Inc.,* 293 Md. 575, 578–79, 446 A.2d 55, 57 (1982).

Although the Majority is correct in stating that § 3D(b) and § 8(a) can be harmonized in a way that avoids "a construction that is illogical, or inconsistent with common sense," *see* 420 Md. at 183, 21 A.3d at 1122 (2011) (citations omitted), the Majority opinion's attempt at singing that harmony is off-key. To be sure, § 8(a) does provide discretion to the Board to "structure the transaction for maximum public benefit," 420 Md. at 183, 21 A.3d at 1123 (2011); however, this discretion is limited to the sale or transfer of properties "no longer needed for public use." § 8(a). The Majority opinion's analysis elimi-

nates this limitation from the statute altogether and renders the phrase nugatory, contrary to well-settled rules of statutory interpretation.

In analyzing the sale of public property by the Board, the primary question for the Court is whether the property is still "needed for public use." *See, e.g., SENA,* 387 Md. 468, 876 A.2d 58 (2005) (road closure); *Inlet Assocs. v. Assateague House Condo. Ass'n,* 313 Md. 413, 432, 545 A.2d 1296, 1306 (1988) (sale of public alley and riparian rights); *Baltimore County v. Letke,* 268 Md. 110, 299 A.2d 781 (1973) (private purchase of public land); *Ward v. Mayor of Baltimore,* 267 Md. 576, 298 A.2d 382 (1973) (sale of park land to build a highway); *Patuxent Oil Co. v. County Comm'rs of Anne Arundel County,* 212 Md. 543, 129 A.2d 847 (1957) (proposed purchase of land under a public wharf to construct pipelines). Although the Board need not state explicitly the words "no longer needed for public use," an equivalent determination that there is no longer a public need for the property is a prerequisite to a valid transfer of the property. *See Inlet Assocs.,* 313 Md. at 431, 545 A.2d at 1305 ("While [sections] of the City Charter separately authorize the City Council to close or abandon a dedicated street, a determination that there is no longer any public need for the street is a requisite to the validity of the Council's action.").

### III. *SENA*

The parties to the present case rely heavily on this Court's decision in *SENA* to support their respective positions.[1]  In

----

1. The Board posits that the "Public Need Test" requires two findings of fact:

    [F]irst, that the governing body has identified and considered the existing public use [of the] property in question;  and second, that the governing body has determined that it no longer needs to own and operate that property for the existing public use.

    This interpretation, however, changes the meaning of the test set forth in *South Easton Neighborhood Ass'n, Inc. v. Town of Easton ("SENA"),* 387 Md. 468, 489, 876 A.2d 58, 71 (2005). The test articulated by the Court in *SENA* states there are two intertwined legal concepts in play. *Id.* "The first is the authority of a municipal corporation to convey governmental real property," i.e., whether there is either inherent or statutory authority. *Id.* "The second issue is the authority of a municipal corporation to close permanently a public street." *Id.* Applied to the present case, the Court must determine whether the Board has the

explicating its decision, however, the Majority opinion exerts little effort to analogize, distinguish, or explain this case. The issue in *SENA*, similar to the issue in the present case, was whether the requirement that the local government must determine that a public road "is no longer needed for any public use" [2] prior to conveying public property, prohibits the local government from "conveying public property to a private person or entity if a limited minority of [the] public uses the public property for convenience." *SENA*, 387 Md. at 476–77, 876 A.2d at 64.

In *SENA*, Easton's Town Council decided to close Adkins Avenue and transfer the land upon which the street laid to a local hospital for an expansion project and to a religious temple. *See SENA*, 387 Md. at 482, 876 A.2d at 66. Relying on several findings of fact, the Town Council determined ultimately that the road was "no longer needed for any public use." *Id.* These facts were incorporated in Ordinance No. 466 and "included: 1) Adkins Avenue is used as a convenience by area residents in lieu of Wye Avenue; [and] 2) SHS would maintain a means of access of transit between [two streets] in the event that an emergency would close access...." *Id.* Further, the Town Council found that "closing a portion of

---

authority to convey public property in the first instance and then whether the Board has the authority to privatize these specific water and wastewater facilities.

Appleton relies on factual distinctions between *SENA* and the present case. In its reply brief, Appleton notes that the two cases are different fundamentally, as *SENA* deals with a "single obsolete roadbed," and the present case deals with "Cecil County's vital water and wastewater facilities." Further, Appleton points out that the closure and conveyance of a road bed is very different from a sale of an entire water and wastewater system under the condition that it continue to operate as a water and wastewater system serving the public. *See infra* 420 Md. at 178–80, 21 A.3d at 1120–21 (2011).

**2.** Maryland Code (1957, 2005 Repl.Vol.), Article 23A, § 2(b)(24) states that any municipality in Maryland has the power "to sell at a public or private sale after twenty days' public notice and to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the municipality when such legislative body determines that the same is no longer needed for any public use."

Adkins Avenue was in the best interest of the public in providing improved emergency medical services to the Town," and that there was no benefit to retaining public ownership of the portion to be closed. *Id.*

The citizens proposed an absolute no-use threshold before the sale of publicly-used land may occur, arguing that because the road was traveled on—albeit only infrequently—the Town Council could not transfer the land. *See SENA*, 387 Md. at 495, 876 A.2d at 74. The Court dismissed this argument as ignoring unreasonably two principles of statutory interpretation: (1) it replaces "needed" with "used," thereby changing the plain meaning of the statute; and (2) it would produce absurd results by foreclosing any conveyance regardless of any legislative determinations. *See id.* The Court also dismissed the citizens' argument that it was not clear from the record that the Town determined that the road was "no longer needed for public use" because Ordinance No.466 did not use those exact words, explaining that the Ordinance went through several levels of approval "without so much as a suggestion for any other future public use." *See SENA*, 387 Md. at 495, 876 A.2d at 74–75.

The facts of *SENA* are distinguishable readily from the present case in several ways. For one, the road in *SENA* was such that it was rarely used and citizens had other reasonable alternatives to circumnavigate the area. *See SENA*, 387 Md. at 479–80, 876 A.2d at 64–65. The water and wastewater facilities in the present case, on the other hand, are the sole source of water for residents in each facility's service area. Continuous use and need is further emphasized by Sections 6.1 and 4.5(c) of the Asset Purchase Agreements,[3] which state

---

3.  The Asset Purchase Agreements provide, in pertinent part:

    **Section 6.1** requires the County, prior to closing, to "conduct the operations of the Facilities, the Water Transmission and Distribution Systems [Wastewater Collection Systems] and the other Purchased Assets according to its ordinary and usual course of business". **Section 4.5(c)** states that, "to the County's Knowledge, the Owned Real Property, the Leased Property and Easements comprise all of the real property interests necessary for the Buyer to operate the

that the County will operate the facilities as normal on the date immediately preceding the transfer, and, on the date of transfer, Artesian will begin operation seamlessly. These provisions also reinforce the conclusion that there is neither an alternative to the specific facilities in the franchise area, nor a parallel alternative that would give the same service and rate guarantees as if the facilities had not been privatized. *See SENA*, 387 Md. at 485, 876 A.2d at 68 (the finding of an adequate parallel alternative may support the determination that the public use is "no longer needed"). As the frequency of use and availability of alternatives for the water treatment facilities at issue in the present case differ greatly from those of the road in *SENA*, the two cases are distinguishable in a meaningful way.

Much like a road is operated by a Town or County for the benefit of the public at large, water conveyance and treatment facilities operated by the County are for the benefit, use, and convenience of the public. *See Inlet Assocs.*, 313 Md. at 430, 545 A.2d at 1305 (applying principles of public roads with publicly-owned riparian land). Whether to close or sell a publicly owned facility or street, therefore, "necessarily turns 'upon considerations of public benefit, and not by barter and sale of private interests....'" *Inlet Assocs.*, 313 Md. at 431, 545 A.2d at 1305 (quoting *Perellis v. Mayor of Baltimore*, 190 Md. 86, 95, 57 A.2d 341, 346 (1948)); *see also Rescue Fire Co. of Cambridge v. County Comm'rs of Dorchester County*, 188 Md. 354, 357, 52 A.2d 733, 735 (1947) (counties, incorporated towns, and cities are public corporations "with political powers, to be exercised for purposes connected with the public good" and are the "sole trustees of the public interest"); *Van Witsen v. Gutman*, 79 Md. 405, 411, 29 A. 608, 610 (1894) ("The Legislature has the power to direct that private property shall be taken for the public use"). The Town in *SENA* noted that the benefit of closing the road outweighed the

---

Facilities and the Water Transmission and Distribution Systems [Wastewater Collection Systems] after the Closing as they are each presently being conducted by the county and they will each be conducted by the County on the Closing Date."

benefit of retaining public ownership—i.e., the increased quality of medical care projected from the proposed use is more important than the convenience *vel non* of a small number of residents. *SENA* 387 Md. at 482, 876 A.2d at 66–67.

In the present case, however, the opposing benefits are not weighed as easily as in *SENA*. On the one hand, the Board claims that the County will save nine million dollars, as well as the twenty-seven million dollars required to make capital improvements to the facilities. On the other hand, Appleton contends that the franchises will lead to rate increases and high density development in the franchise areas. As a private company, Artesian is held accountable to its investors and not necessarily the citizens using the facilities; therefore, as the argument goes, increasing profits may outweigh maintaining reasonable rates. Another arguable potential negative effect of privatization is that, eventually, Artesian may be unable to maintain the facilities to the proper standards or could go bankrupt. The Board included reversionary provisions in the Asset Purchase Agreement to safeguard against any service stoppage, which evidences the Board's emphasis on ensuring continuous operation of the facilities as an essential service to County residents. Accordingly, it is not clear whether the benefit to the County outweighs the costs that the citizens may bear, unlike the tradeoff in *SENA* where the potential benefits outweighed clearly the potential costs.

In the present case, the public use of the facilities forecloses conveyance of the facilities. This outcome, however, does not foreclose *any* transfer of the water or wastewater facilities, nor does it mandate an "absolute no-use standard," as the Board suggests. Section 3D(b) authorizes county commissioners to grant one or more franchises for water and sewerage systems. Section 8(a) then provides county commissioners with discretion to sell or transfer publicly owned property that is "no longer needed for public use." It is still possible, therefore, to transfer facilities, at the discretion of the Board, in the first instance (under § 3D(b))—when the facilities are not yet in public use—or after a finding that already in use facilities are "no longer needed for public use" (under § 8(a)).

For example, the "Original Elkton West Service Area," where no County-owned or operated facilities were located, could be sold to Artesian as the service area is not yet "needed for public use." When the County expanded the franchise area to include service areas that had existing service facilities, however, pursuant to § 8(a), the option to sell the entire franchise area was unavailable. In this way, the two sections may be harmonized to avoid rendering the phrase "no longer needed for public use" nugatory, while giving the Board discretion (if exercised properly) to sell public facilities.

### IV. *Public Use Status*

The primary emphasis in analyzing statutes mandating a determination that property is "no longer needed for public use," before transfer to a private owner is permitted, is on the actual nature of the use of the property.[4] "Public use" is a somewhat vague term and "there is 'no satisfactory single clear-cut rule ... which can decide all cases....' " *SENA*, 387 Md. at 492, 876 A.2d at 73 (2005) (quoting *Green v. High Ridge Ass'n, Inc.*, 346 Md. 65, 73, 695 A.2d 125, 128 (1997)); *see also Prince George's County v. Collington Crossroads, Inc.*, 275 Md. 171, 181, 339 A.2d 278, 284 (1975) ("[E]ven if it

---

4. The Board asserts that the pivotal question is "Needed by whom?" The answer, it suggests, is "manifestly" the County as the owner of the property. The Majority opinion accepts impliedly this assertion by the Board, asking only whether the water systems are "needed for the public use *by Cecil County*," and states:

> Artesian, by providing, among other things, the personnel, administration, necessary upkeep and capital improvements, engineering expertise and flexibility as to discharge credits, as well as assuming major liabilities and obligations providing a financial benefit to the County, will essentially remove the existing water and wastewater facilities from the County needs inventory, even though the Facilities will continue to be maintained for a public use, purpose and benefit to the citizens of Cecil County.

See 420 Md. at 181–82, 21 A.3d at 1121–22 (2011) (quoting Circuit Court decision). This is an incorrect reading of the statute after *SENA*, which emphasizes that the determination in cases involving the transfer of a public function to a private owner is "determined by its use, and not by the private status of the property owner." *SENA*, 387 Md. at

were possible to formulate such a rule, it would probably not be prudent to do so."); *Riden v. Phila., Balt. & Wash. R.R. Co.,* 182 Md. 336, 340–41, 35 A.2d 99, 101 (1943) ("[C]ourts have striven to formulate a uniform definition, but without success."). The question of whether a use is "public," therefore, is for the judiciary, though legislative determinations will be given some weight. *See Green,* 346 Md. at 73, 695 A.2d at 128–29 (1997) (citations omitted); *see also Collington Crossroads,* 275 Md. at 181, 339 A.2d at 284 ("[T]he Legislature cannot make a use public merely by declaring it so.") (quoting *Riden,* 182 Md. at 340, 35 A.2d at 101) (citations omitted).

A legislative grant of a franchise, as in the present case, or a closure of a road by a county or municipality, as in *SENA,* does not "destroy the public character" inherently of the property. *Compare Collington Crossroads,* 275. Md. at 187, 339 A.2d at 286–87 ("[T]he public character of a condemnation is not necessarily changed because a private entity will own the property.") *with* 420 Md. at 181, 21 A.3d at 1121 (2011) (That the County may grant a franchise to provide water services "made superfluous the continuing 'public use' of the facilities by the County by its lawful action in granting the franchises to Artesian."). Further, stating baldly that the property is "no longer needed for public use" is not enough to transfer validly public property to a private entity. *See, e.g., SENA,* 387 Md. at 482, 876 A.2d at 66–67 ("[M]ere incantation of the 'magic words' of a legal test, as an adherence to form over substance may not cause the Genie to appear and is neither required nor desired if actual consideration ... is apparent...."); *Faulk v. Ewing,* 371 Md. 284, 305, 808 A.2d 1262, 1276 (2002) ("[W]e shall not elevate form over substance"). A County, town, or municipality (and reviewing courts) must make a determination, based on the facts in the record, that the property is no longer needed in fact for use by the public.[5] In the present case, the Board avoided the public

---

497, 876 A.2d at 76 (2005). *See Perellis v. Mayor of Baltimore,* 190 Md. 86, 92–95, 57 A.2d 341, 344–45 (1948).

5. *See, e.g., SENA,* 387 Md. at 482, 876 A.2d at 66–67 (Ordinance 466, authorizing the closure, included factual findings regarding the current public use); *Baltimore County v. Letke,* 268 Md. 110, 115–16, 299 A.2d

use issue in all of the various letters and meetings prior to the adoption of the resolutions approving the expansion and sale of the franchise.[6]  Today, the Majority opinion follows suit.

Where the general public uses the property in a continuous manner (as distinguished from the road in *SENA* ), I would hold that the property is not "no longer needed for public use," and, therefore, the local government does not have the authority under § 8(a) to sell or transfer the property in question.  Therefore, the Board of Commissioners of Cecil County did not have authorization to sell the water and

---

781, 784 (1973) (requiring departmental clearances, advertisements soliciting written objections, and executive approval prior to a determination that a public property is no longer needed for public use); *Inlet Assocs. v. Assateague House Condo. Ass'n.*, 313 Md. 413, 431, 545 A.2d 1296, 1305 (1988) ("[A] determination that there is no longer any public need for the street is a requisite to the validity of the Council's action."); *Cristofani v. Bd. of Educ. of Prince George's County*, 98 Md.App. 90, 96–97, 632 A.2d 447, 450 (1993) ("[U]nder the statute, a mere non-use would not authorize the sale or conveyance of public property.  There must also be a specific legislative finding that no public need or use for the property remains.").

**6.**  When citizens inquired as to the legality of the transfer, given the limitation in § 8(a), the Board did not state that the property was determined to be "no longer needed for public use," much less provide any reasoning for such a determination.  Instead, the response was that the Board "ha[s] the plenary power under Article 25, Section 8 of the Code to sell and convey real property when [it] deem[s] it to be in the public interest to do so."  Further, Appleton notes that there was no mention of the lack of need for public use in any of the following documents in the record:

1. Asset Purchase Agreements
2. Commissioner's Minutes of 5 August 2008
3. Commissioners' Minutes of 19 August 2008
4. Legal Advertisement for Public Hearing
5. County Administrator's memorandum of 16 September 2008
6. Commissioners' Minutes of 16 September 2008
7. Commissioners' Minutes of 23 September 2008

The Commissioners' Minutes include a recitation of the Resolutions adopted at the 6 October 2008 meeting.  In these Resolutions, the Commissioners explicitly state "the Board of County Commissioners has determined that the facilities and the respective associated parcels of property ... [are] no longer needed for public use...."  There, however, is no mention of how this determination was made or what factors led to this determination.

wastewater facilities, being that the facilities are still in continuous public use.

Judge BATTAGLIA and Judge GREENE authorized me to state that they join in the views expressed in this dissenting opinion.